[No. 14149-7-III. Division Three. March 19, 1996.]

THE CITY OF ELLENSBURG, *Appellant*, v. KING
VIDEOCABLE COMPANY, *Respondent*.

902

*James D. Maloney III* and *Weeks & Skala*, for appellant.

*Ernest L Reveal, Tod R. Dubow*, and *Robins, Kaplan, Miller & Ciresi* (of California), for respondent.

*Daniel M. Waggoner* and *Gregory J. Kopta* on behalf of Washington State Cable Communications Association, amicus curiae.

THOMPSON, C.J. — The City of Ellensburg commenced this declaratory action against King Videocable Company, alleging a material breach of the parties' franchise agreement governing cable television services. King asserted a federal preemption defense. On cross-motions for summary judgment, King's motion was granted. Ellensburg appealed and King cross-appealed. We reverse and remand.

## FACTS

The 15-year franchise agreement at issue was executed in April 1984, and codified at Ellensburg, Wash., Code (EC) ch. 11.8 (1984), as the Ellensburg/King Videocable Company Franchise Ordinance (herein franchise). Within four months of its effective date, the franchise required King to provide a minimum of 17 channels of basic service and three channels of tiered service. EC § 11.8.30. Within 30 months, King was to provide a minimum of 20 channels of basic service. EC § 11.8.30(c). The franchise defines

basic service as channels provided to subscribers for the minimum fee charged. EC § 11.8.02(a). The term tiered service is defined as channels offered to subscribers for monthly charges in addition to those for basic service, but less than per-channel charges for pay service. EC § 11.8.02(s). The franchise specifies the types of programming to be carried as basic service and as tiered service,[1] although King has the right to replace its offerings from time to time subject to specified criteria. EC § 11.8.30.

In April 1993, King reduced the number of channels on its basic service from 21 to 17. Ellensburg notified King it was in violation of the franchise by failing to provide a minimum of 20 channels of basic service and five channels of programming required by EC § 11.8.30. King claimed the requirements were preempted by 47 U.S.C. § 543(b)(7), enacted as part of the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (1992 Cable Act), and refused to restore the four channels. Ellensburg thereupon commenced this action in Kittitas County Superior Court.

On November 5, 1993, King removed this action to the United States District Court for Eastern Washington. Ellensburg moved to remand on the basis the federal court lacked jurisdiction. Ellensburg's motion was granted and the action was remanded to the Kittitas County Superior Court. *City of Ellensburg v. King Videocable Co.*, No. CY-93-3124-AAM (E.D. Wash. December 20, 1993) (order remanding).

After the Superior Court entered its order on the parties' cross-motions for summary judgment, both parties appealed. Permission to file an amicus brief was granted the Washington State Cable Communications Association.

---

[1]EC § 11.8.30(b) required five channels in the area of (1) health/nutrition/consumer; (2) 24-hour news; (3) general entertainment/variety; (4) children/art; and (5) religious/family/spiritual.

PRIMARY JURISDICTION

We address first King's contention that the doctrine of primary jurisdiction precludes our review.

■■ The doctrine of primary jurisdiction applies to a claim which is originally cognizable in the courts, but its enforcement "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . . ." *United States v. Western Pac. Ry. Co.*, 352 U.S. 59, 77 S. Ct. 161, 162, 1 L. Ed. 2d 126 (1956). The doctrine of primary jurisdiction requires only that a court enable referral of a claim within the agency's special competence to an administrative agency. It does not deprive the court of jurisdiction. *Reiter v. Cooper*, 507 U.S. 258, 113 S. Ct. 1213, 1215, 122 L. Ed. 2d 604 (1993).

The question presented in this appeal is whether Congress retroactively preempted franchise provisions governing the number of cable television channels and general programming categories to be carried on a basic service tier. This is not a question Congress directed to the Federal Communications Commission (FCC), nor does it require interpretation of any FCC rule or regulation.[2] Further, unlike the situation in *Action for Childrens Television v. F.C.C.*, 827 F. Supp. 4 (D.D.C. 1993), *aff'd*, 59 F.3d 1249 (D.C. Cir. 1995), *cert. denied*, 116 S. Ct. 773 (1996), Ellensburg is not claiming that an FCC policy, practice or order violates the Cable Acts, which triggers the exclusive jurisdiction provisions of 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). Our review is not precluded either on jurisdic-

---

[2]*See generally City of Ellensburg v. King Videocable Co.*, No. CY-93-3124-AAM (E.D. Wash. December 20, 1993) (order remanding at 7-14). Even if we were to adopt the conclusions reached in the FCC Reports and Orders cited by King, we are not required to interpret any FCC rule or regulation in deciding this appeal.

tional grounds or pursuant to the doctrine of primary jurisdiction.[3]

## STANDARD OF REVIEW

■ There are no disputed facts in these appeals. Only issues of law are presented. Issues of law decided on summary judgment are reviewed de novo. *Rice v. Dow Chem. Co.*, 124 Wn.2d 205, 208, 875 P.2d 1213 (1994).

## OVERVIEW

Before addressing the parties' remaining contentions, it is helpful to begin with a brief overview of the regulation of cable television.

## Statutory Background

Until 1984, the regulation of the cable television industry was an amalgam of local, state and federal regulations, with most regulation taking place through the local franchise process. H.R. Rep. No. 628, 102 Cong., 2d Sess. 29 (1992). *See generally* Robert F. Copple, *Cable Television and the Allocation of Regulatory Power: A Study of Government Demarcation and Roles*, 44 Fed. Comm. L.J. 1 (1991). In 1984, Congress passed the Cable Communications Policy Act, Pub. L. No. 98-549, 98 Stat. 2779 (codified at 47 U.S.C. §§ 521-559) (1984 Cable Act), thereby establishing a national policy concerning cable communications. The 1984 Cable Act retained the local, state and federal regulatory system established by the FCC in the 1970s, although the exercise of local authority was more restricted. Rates for basic cable television services were deregulated where there was "effective competition" as defined by the FCC.

---

[3]King's contention that Ellensburg failed to exhaust its administrative remedies also lacks merit. This is, essentially, an action for breach of contract. Further, King did not plead nor argue Ellensburg's failure to exhaust administrative remedies in the superior court action.

By 1992, cable rates in approximately 97 percent of the franchises were deregulated. 47 U.S.C.A. § 521 note (a)(20) (Supp. 1995) (Congressional Findings and Policy: Cable Television Consumer Protection and Competition Act of 1992). With deregulation came a substantial increase in monthly rates and most subscribers had no opportunity to select between competing cable television systems. 47 U.S.C.A. § 521 note (a)(1), (2) (Supp. 1995). Such occurrences provided the impetus for passage of the 1992 Cable Act. 47 U.S.C.A. § 521 note (a)(20) (Supp. 1995).

The 1992 Cable Act repealed the deregulatory framework of the 1984 Cable Act, although its provisions go beyond the arena of rate regulation. *See* Nicholas W. Allard, *The 1992 Cable Act: Just the Beginning*, 15 Hastings Comm/Ent L.J. 305 (1993); Rafael G. Prohias, *Longer than the Old Testament, More Confusing than the Tax Code: An Analysis of the 1992 Cable Act*, 2 CommLaw Conspectus 81 (1994). Congress expressed the purposes of the 1992 Cable Act in the following terms:

"(1) promote the availability to the public of a diversity of views and information through cable television and other video distribution media;

"(2) rely on the marketplace, to the maximum extent feasible, to achieve that availability;

"(3) ensure that cable operators continue to expand, where economically justified, their capacity and the programs offered over their cable systems;

"(4) where cable television systems are not subject to effective competition, ensure that consumer interests are protected in receipt of cable service; and

"(5) ensure that cable television operators do not have undue market power vis-a-vis video programmers and consumers."

47 U.S.C.A. § 521 note (b) (Supp. 1995).

Included as part of the 1992 Cable Act is a provision, codified at 47 U.S.C. § 543(b)(7), which defines the components of a basic service tier as follows:

**(A) Minimum contents**

Each cable operator of a cable system shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier of service. Such basic service tier shall, at a minimum, consist of the following:

(i) All signals carried in fulfillment of the ["must carry"] requirements of Sections 534 and 535[4] of this title.

(ii) Any public, educational, and government ["PEG"] access programming required by the franchise of the cable system to be provided to subscribers.

(iii) Any signal of any television broadcast station that is provided by the cable operator to any subscriber, except a signal which is secondarily transmitted by a satellite carrier beyond the local service area of such station.

**(B) Permitted additions to basic tier**

A cable operator may add additional video programming signals or services to the basic service tier.

CONTENTIONS

Ellensburg contends King materially breached its franchise by refusing to comply with the provisions governing minimum channel and general programming requirements on the basic service tier. In response to King's defense that Section 543(b)(7) preempts these requirements, Ellensburg contends the section only establishes the minimum content of basic services, not the maximum content. Further, the section has prospective application only. Ellensburg relies primarily on the language of the statute, principles of statutory construction and *James Cable Partners, L.P. v. City of Jamestown,* 43 F.3d 277 (6th Cir. 1995).

---

[4]47 U.S.C. § 535(a) requires operators to carry qualified noncommercial PEG television stations. Section 534(a) requires cable operators to carry the signals of local commercial television stations and qualified low power stations. Section 534(a) states that carriage of additional broadcast television signals "shall be at the discretion of such operator, subject to section 325(b) . . . ."

King contends that in Section 543(b)(7), Congress identified the channels whose carriage was mandated, specified the minimum contents of the basic service tier, and made carriage of other channels discretionary with cable operators. According to King, such a statutory scheme shows congressional intent to prevent franchising authorities from regulating the number and type of basic tier programs. Because the franchise provisions at issue conflict with Section 543(b)(7), they are preempted pursuant to Section 556(c).[5] Although numerous authorities are cited, King relies primarily on language contained in certain FCC reports and orders not published in the *Federal Register*,[6] *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151 (D.C. Cir. 1995) and *Cablevision Sys. Corp. v. Town of E. Hampton*, 862 F. Supp. 875 (E.D.N.Y. 1994), *aff'd*, 57 F.3d 1062 (2d Cir. 1995).

*James Cable, Time Warner*, and *Cablevision* were all decided after this appeal was filed.

### PREEMPTION

The question whether Section 543 permits local regulation of the components of the basic service tier was at issue in both *Time Warner* and *Cablevision*.

*Time Warner* involved a challenge to several aspects of an FCC order implementing the 1992 Cable Act. The court concluded that apart from certain programming requirements enumerated in Section 543(b)(7)(A), the 1992 Cable Act preempts local regulation of the components of the

---

[5]47 U.S.C. § 556(c) provides that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded."

[6]King cites "*Report and Order* in MM Docket No. 92-266, FCC 93-177 (May 3, 1993), at p. 108, 58 Fed. Reg. 29736 (May 21, 1993)" and "*First Order on Reconsideration*, MM Docket No. 92-266, dated August 27, 1993." King also cites 44 U.S.C. § 1507, which requires the contents of the *Federal Register* to be judicially noticed. Resp't's Br. at 14-16. However, the portions of the FCC reports and orders relied on by King were never published in the *Federal Register*, although a synopsis of FCC 93-177 did appear at 58 Fed. Reg. 29,736 (1993).

basic tier. The court reasoned that although no single provision of the Act would be violated by allowing local franchising authorities to regulate programming, when read as a whole, it was clear Congress intended to leave such decisions to cable operators. Because congressional intent was clear, *Time Warner* did not reach the question of whether the FCC's interpretation was entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).

[B]y dividing the basic service tier components into "minimum contents" and "permitted additions," Congress defined the minimum *and maximum* of programming possibilities. In other words, § 543(b)(7)(A) describes the programming elements that all systems must offer and § 543(b)(7)(B) lists the universe of possible additions. Because neither subsection (A) nor subsection (B) includes non-PEG programs required by franchising authorities, Congress did not intend to include such programming on the basic service tier. Second, by providing that the basic [service] tier must include *PEG programs* required by the franchise, the 1992 Cable Act suggests that franchising authorities cannot require other types of programs on the basic tier. Third, because the 1992 Cable Act specifically permits cable operators to add programs of their choice to the basic service tier, any programming limitations posed by franchise agreements would conflict with that express statutory authorization.[20] If, for example, the franchising authority forbade a cable operator from offering sports programs on its basic tier, the cable operator would be deprived of its statutory authority to "add additional video programming signals or services to the basic service tier." *Id.*[21]

---

[20]The Conference Report, which describes the composition of the basic tier as "all [public access] signals required to be carried under [47 U.S.C. §§ 534 & 535], any public, educational, and governmental access programming, and any signal of any broadcast station provided by the cable operator, as well as other video programming signals *that the cable operator may choose to provide on the basic tier,*" CONF. REP. at 60, U.S. Code Cong. & Admin. News 1992, p. 1242 (emphasis added), underscores that Congress envisioned cable operator control over basic tier programming, subject only to the minimum statutory requirements.

[21]The Cities' attempt to circumvent this language by arguing that franchise agreements do not interfere with the operator's ability to "add" channels because

the operator enters into such contracts "voluntarily" is unconvincing. Programming requirements imposed by a franchising authority as a condition of obtaining a franchise are virtually equivalent to direct government regulation.

*Time Warner*, 56 F.3d at 197[7] (emphasis added).

In *Cablevision*, a town was about to revoke a cable operator's 1985 franchise after the operator announced it was going to introduce a new 10-channel, entry-level tier of service, eliminate a 30-channel tier, and increase rates for a 36 broadcast entry-level tier. Before the revocation hearing was held, the cable operator filed a request for modification of the franchise agreement pursuant to 47 U.S.C. § 545. Ultimately, the matters were before the *Cablevision* court, where the town contended the operator materially breached its franchise and the operator contended the franchise's content requirements were preempted by Section 543(b)(7).

Unlike *Time Warner*, *Cablevision* did not find clear congressional intent to preempt local regulation of the components of the basic service tier. *Cablevision*, 862 F. Supp. at 882. Accordingly, the court undertook an inquiry as to whether an FCC interpretation of Section 543(b)(7)[8] was permissible and entitled to deference under *Chevron*. After determining the interpretation was permissible and entitled to deference, *Cablevision* concluded that Section 543 preempts a franchising authority's ability to regulate minimum content requirements on the basic service tier. *Cablevision*, 862 F. Supp. at 882.

■ Even if we were persuaded that Section 543 prospectively preempts a franchisor's ability to impose carriage requirements, the question whether such preemption applies to franchises predating the 1984 Cable Act requires

---

[7]The court also concluded that preemption "effectuates the dual regulatory framework of the 1992 Cable Act, under which franchising authorities have primary responsibility for regulating the basic service tier and the [FCC] regulates cable programming services." *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151, 197 (D.C. Cir. 1995).

[8]The court cited to "Report and Order regarding the 1992 Cable Act (hereinafter 'Rate Order'), FCC 93-177, 58 Fed.Reg. 29736, 1993 WL 169306 (F.R.) (released May 3, 1993)." *Cablevision Sys. Corp. v. Town of E. Hampton*, 862 F. Supp. 875, 881 (E.D.N.Y. 1994), *aff'd*, 57 F.3d 1062 (2nd Cir. 1995).

both an analysis of the principles of retroactivity and the construction of a statutory provision not at issue in *Cablevision*. Not every preemptive statute is retroactive.[9]

RETROACTIVITY

As noted in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S. Ct. 1483, 1499-1501, 128 L. Ed. 2d 229 (1994), there is a long-standing tradition that unless language in a statute requires retroactivity, a court will not give retroactive effect to congressional enactments or administrative rules. The *Landgraf* court reassessed the tradition and determined it was still appropriate because (1) it generally will "coincide with legislative and public expectations" and (2) "[r]equiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." The largest category of cases where the presumption against retroactivity has been applied involves "new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Landgraf*, 114 S. Ct. at 1500.

We find it significant that in passing the 1992 Cable Act, Congress did not amend Section 544(b)(2) or 544(c) of the 1984 Cable Act. Section 544(b)(2)(B) provides that a

---

[9]*See, e.g., Viereck v. Peoples Sav. & Loan Ass'n*, 343 N.W.2d 30 (Minn. 1984) (Garn-St. Germain Depository Institutions Act of 1982 preempted state prohibitions against due-on-sale restrictions in mortgage instruments, but did not apply to loans originated or transferred prior to the effective date of the Act).

*See also James Cable Partners, L.P. v. City of Jamestown*, 43 F.3d 277 (6th Cir. 1995). *James Cable Partners* arose out of a controversy involving the enforceability of an exclusive cable television franchise granted prior to the 1992 Cable Act. Although exclusive franchises were permitted under the 1984 Cable Act, Section 7(a) of the 1992 Cable Act prohibits them. *James Cable Partners* upheld the preexisting exclusive franchise based on principles of retroactivity, notwithstanding the cable operator's attempt "to avoid the weakness of its retroactivity argument by contending that this case is about preemption." *James Cable Partners*, 43 F.3d at 280. The court reasoned that Section 7(a) only prohibited the granting of exclusive contracts, not the enforcement of exclusive contracts existing prior to the adoption of the 1992 Cable Act, and it did not apply retroactively because of the presumption against retroactivity and the absence of language indicated it was to be given retroactive effect.

franchising authority may enforce requirements "for broad categories of video programming . . ." if the franchise were granted *after* the effective date of the 1984 Act. Section 544(c) applies to franchises in effect *prior* to the effective date of the 1984 Act and provides that a franchising authority may, subject to Section 545,[10] enforce requirements contained within the franchise for "the provision of services, facilities, and equipment . . . ." Also left intact by the 1992 Cable Act is 47 U.S.C. § 557, which states that franchises in effect on the effective date of the 1984 Cable Act remain in effect subject to the express provisions of the subchapter for its then current remaining term.

*Time Warner* determined that Section 544(b)(2) was not inconsistent with the 1992 Cable Act because franchising authorities could impose standards governing the "overall service and programming offered by a cable system" without being allowed to dictate what programming must be offered on the basic service tier. *Cablevision* determined that based on the facts before it, the franchising authority was not seeking to regulate a "broad category" of programming or services, but "the particulars of cable service." We have found no reported cases interpreting Section 544(c), nor do the parties or amicus cite any.

 Section 544(c) clearly allows for greater regulation of programming by franchising authorities than Section 544(b)(2). We hold that it allows Ellensburg to enforce the requirement that King provide the five general areas of programming and a minimum of 20 channels on the basic service tier until the franchise expires in 1999, or it is modified pursuant to 47 U.S.C. § 545. We do so because it appears that Congress recognized the potential unfairness of the retroactive application of the 1984 Cable Act by

---

[10]47 U.S.C. § 545(a)(1)(B) provides, in pertinent part, that during the period a franchise is in effect, the cable operator may obtain modifications of the requirements in the franchise "in the case of any such requirement for services, if the cable operator demonstrates that the mix, quality, and level of services required by the franchise at the time it was granted will be maintained after such modification."

enacting Section 544(c). Further, there is no language in Section 543(b)(7) or elsewhere in the 1992 Cable Act, which reflects clear congressional intent to apply Section 543(b)(7) retroactively. If Congress had decided that some policy consideration justified the invalidation of material provisions in a 1984 franchise, it would have stated its intent more clearly. *See James Cable Partners*, 43 F.3d at 280 (citing *Landgraf*, 114 S. Ct. at 1500).

King contends that the purposes of the 1992 Cable Act would be thwarted if Section 543(b)(7) is not applied retroactively. We disagree. The express purposes of the 1992 Act, previously set forth in this opinion, would be fostered by enforcement of the franchise provisions King unilaterally breached. Those provisions promote the availability to the public of a diversity of views and information. 47 U.S.C.A. § 521 note (b) (Supp. 1995). Such availability was arrived at in the marketplace by a contract, the terms of which the parties freely negotiated. *Id.* King has presented no evidence which shows how the provisions at issue would obstruct the regulatory scheme envisioned by Congress if they were enforced.

As to King's contention that the FCC's interpretation must be given deference, there has been no showing of any actual conflict between the FCC's interpretation in its rate order and enforcement of the carriage provision requirements at issue. Although an agency's construction of a statute is entitled to deference under circumstances defined in *Chevron*, the FCC's interpretation does not fall within those circumstances. *Landgraf*, not *Chevron*, is determinative on the issue of retroactivity.

As to amicus' contention that enforcement of the franchise would "impose potentially tremendous technical and financial hardship on cable operators to serve individual franchising authorities' parochial desires," we remind amicus that our review is limited by the record before the trial court on the parties' cross-motions for summary judgment and there is no factual or technical information in

the record which enables us to respond to the contention, even if it were persuasive on the issue of retroactivity.

## MODIFICATION

Although we conclude that, based on undisputed facts, King materially breached its franchise, we are not declaring a forfeiture. We are remanding for entry of an order of specific performance. King may, of course, proceed in accordance with 47 U.S.C. § 545, which sets forth standards and procedures by which a cable operator may modify service requirements in a franchise. Section 545 was part of the 1984 Cable Act and was not amended in 1992. As stated by one commentator,

> [T]he modification section establishes standards to be applied when a cable operator desires to alter its obligations under a franchise. By providing modification standards, the [1984 Cable] Act discourages the virtually uncontrolled overbidding and reneging that has been an ongoing problem in franchise processes throughout much of the history of cable television. At the same time, the modification standards take into consideration the somewhat volatile and fragile nature of the cable industry in a competitive telecommunications market where new services come and go at a prolific rate . . . .

44 Fed. Comm. L.J. at 95-96 (footnotes omitted).

In addition to the modification provisions of Section 545, the franchise at issue clearly states that, notwithstanding the channel offering requirements,

> [King] shall have the exclusive right to replace all Channel selections, designations or offerings from time to time [as] it deems such replacement to be in the best interests of its Subscribers; provided that, [King] shall include a wide spectrum of entertainment, educational, news, sports and other generally available programming as part of Basic Service.
> . . .

EC § 11.8.30.

King's decision to unilaterally change its programming and decrease its channel offerings without proceeding to modify the agreement under Section 545 is contrary to the purpose and intent of the unamended sections of the 1984 Cable Act. It is also contrary to the terms of the franchise. This court will not assist King in retaining the benefits of a negotiated franchise agreement without accepting its corresponding obligations and following the procedures available for modification.

## CROSS-APPEAL

King cross-appeals dicta in the superior court's opinion which states that once King retained seven channels after passage of the 1992 Cable Act, it was bound to keep those channels until expiration of the franchise or "Congress rides again on the Cable Act."

As stated previously in this opinion, King is contractually bound to the terms of its bargain. It may, however, seek modification of the franchise in accordance with 47 U.S.C. § 545 or replace offerings as provided in EC § 11.8.30. To this extent, the superior court's dicta is in error.

We reverse and remand.

MUNSON and SWEENEY, JJ., concur.

Review denied at 129 Wn.2d 1028 (1996).