[No. 16879-4-III.   Division Three.   March 2, 1999.]

*In the Matter of the License to Practice Pharmacy of*
JOSEPH FARINA, R.PH.

*In the Matter of the License to Practice Pharmacy of*
CONSULTING AND PHARMACEUTICAL SERVICES, INC.

JOSEPH FARINA, R.PH., ET AL., *Respondents*, v. THE DEPARTMENT OF HEALTH, BOARD OF PHARMACY, ET AL., *Appellant*.

---

*Christine O. Gregoire, Attorney General*, and *David M. Hankins, Assistant*, for appellant.

*Walter G. Meyer, Jr.*, and *Mark D. Watson* of *Meyer, Fluegge & Tenney*, for respondents.

SWEENEY, J. — This appeal requires us to harmonize inconsistent parallel regulatory schemes governing home health care and pharmacy respectively.

RCW 70.126 is the enabling act which authorizes the Washington State Department of Health (Department) to establish home health care agencies. Pursuant to that stat-

ute, the Department promulgated WAC 246-327. RCW 18.64 is the enabling act which created the Washington State Board of Pharmacy (Board) to regulate the practice of pharmacy, pursuant to which the Board promulgated licensing regulations in WAC 246-869.

Joseph Farina is a licensed pharmacist. He owns two pharmacies and a home health care franchise. The Board applied pharmacy regulations to the operation of his home health care facility. By doing so, it concluded that Mr. Farina violated a number of pharmacy regulations. It therefore suspended his license to practice pharmacy.

The question presented is whether, under the home health care and pharmacy regulations operative at the time, the Board could suspend Mr. Farina's pharmacy license for dispensing drugs at his separately licensed home health care agency, even though the home health care agency was operating in compliance with the home health care regulations. We conclude it could not. We also agree with the superior court that any violations were technical and inadvertent. We therefore reverse the sanctions.

## FACTS

Mr. Farina has been a licensed pharmacist since 1975. He owns two licensed pharmacies in Yakima: Consulting And Pharmaceutical Services, Inc. (C.A.P.S.) and Pharmaco d/b/a Option Care.

*Option Care*: Option Care is a franchised home health care agency, licensed under RCW 70.127. Home health care agencies provide in-home services to patients who would otherwise be hospitalized long-term. Among other services, the agency provides total parenteral nutrition (TPN)[1] supplemented with intravenous (IV) prescription medications in the home. Generally, pain management is accomplished by means of self-administered IV narcotics. These services are prescribed by a physician and carried

---

[1]Parenteral products are sterile preparations for injection through one or more layers of skin. WAC 246-871-010(4).

out by registered nurses. The nurses train patients and family members to administer the IV in the home.

In 1987, Mr. Farina expanded his Yakima Option Care franchise with a branch office in Wenatchee. The Wenatchee branch operated under Pharmaco's home health care license. When a physician referred a patient to Option Care Wenatchee, the standard procedure was to fax the patient's records and prescriptions to Option Care Yakima. There, licensed pharmacists prepared the medications and TPN solutions and sent them by courier to Wenatchee to be administered by a nurse.

Occasionally drugs were needed immediately, such as for a new patient referral on short notice or before a holiday, or to accommodate a sudden increase in the dosage. At first, Option Care Wenatchee obtained these emergency medications at the local hospital pharmacy. The branch agency was, however, very successful and expanded rapidly. So the local pharmacies stopped selling it drugs, citing professional competition considerations.

To meet these emergencies, then, some drugs were kept on-site, to be mixed and administered by the nurses. The nurses were trained by the Yakima pharmacists to prepare narcotics and antibiotics, as well as TPNs. These were stored in a file cabinet called the "emergency box." Before they actually mixed anything, nurses telephoned the Yakima pharmacy, and a pharmacist then talked them through the procedure step by step. Some mixing of drugs was done in patients' homes, following a pharmacist's prior calculations and instructions.

The quantity of stored drugs increased with the volume of patients. The nurses believed they were acting within the scope of accepted nursing practice in mixing prescription drugs and TPNs when necessary. In 1990, the Joint Commission on Accreditation for Home Care Organizations, a national accreditation company, inspected the Wenatchee site and approved the operation.

The business then moved to its present location. The new facility included a room for storing and preparing

emergency medications and TPNs. It had a laminar airflow hood[2] for sterile work. The room was not accessible to the public and was locked. The staff called this room the "pharmacy," and someone made an 8½-by-11-inch "Pharmacy" sign that was posted inside the room.

Yakima Option Care pharmacists monitored the Wenatchee operation, performed on-site visits, reviewed records, and occasionally mixed TPNs. Because of the increasing volume of work, the nurses asked Mr. Farina to hire a full-time pharmacist. But everyone understood from Mr. Farina that Wenatchee was an extension of the Yakima pharmacy and operated under its license.

When asked in 1991 about Option Care Wenatchee, Mr. Farina told a Board employee that it was a nursing office which stored Heparin and other legend drugs needed to maintain IV lines. In January 1993, following a pre-announced inspection, the Board declared that the Wenatchee facility was an illegal pharmacy and removed the narcotics. All remaining drugs were immediately returned to Yakima.

*C.A.P.S.*: The Board had long been aware of C.A.P.S.'s professional practice. C.A.P.S. had successfully undergone annual Board inspections since 1989. C.A.P.S. supplied medications to institutional customers including nursing homes, medi-centers and Planned Parenthood. C.A.P.S. pharmacists repackaged drugs from manufacturers' containers into smaller, custom-labeled containers for distribution. C.A.P.S. also maintained required records for these customers. The Yakima Health District followed the same system.

 During a 1992 phone call, an inspector told Mr. Farina that if C.A.P.S. were still delivering to the medi-center, he "may want to think about [getting] the manufacturer's license." Mr. Farina questioned the necessity for this, but acceded to the suggestion and applied for the manufacturer's license. Before the license was issued, the Board

---

[2]An enclosed, sterile work surface.

inspected C.A.P.S. and cited it for manufacturing pharmaceuticals without a license.

*Administrative action*: The Board charged Mr. Farina with unprofessional conduct. After an administrative hearing, the Board entered findings and conclusions to the effect that Mr. Farina had both knowingly permitted the practice of pharmacy without the presence of a pharmacist and operated an unlawful pharmacy without a license or controlled substance registration at Wenatchee, and that C.A.P.S. had manufactured drugs without a license or controlled substance registration in Yakima. The Board concluded that this conduct constituted moral turpitude, dishonesty and corruption relating to Mr. Farina's fitness to practice pharmacy.

The Board suspended the pharmacy licenses of C.A.P.S. and Option Care for two years, but granted an immediate conditional stay of the suspension. Mr. Farina's individual pharmacist's license was suspended for five years with permission to apply for a stay after six months if specified conditions were satisfied.

On appeal, the superior court affirmed in part and reversed in part. All parties sought review in this court. We review the Board's findings and conclusions that Wenatchee was a pharmacy subject to pharmacy board regulations and controlled substance registration, that C.A.P.S. was manufacturing drugs, and that Mr. Farina was guilty of moral turpitude.

## DISCUSSION

Standard of Review.

■ Our review is governed by RCW 34.05. We review the findings of the Board, and not the findings of the superior court. *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 323-24, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983); *Biermann v. City of Spokane*, 90 Wn. App. 816, 821, 960 P.2d 434 (1998).

■ *Findings of Fact.* We review findings of fact to

determine whether they are supported by substantial evidence. RCW 34.05.570(3)(e). Substantial evidence is " 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises'." *Heinmiller v. Department of Health*, 127 Wn.2d 595, 607, 903 P.2d 433, 909 P.2d 1294 (1995) (quoting *Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994)), *cert. denied*, 518 U.S. 1006 (1996).

■■■ *Conclusions of Law*. We review conclusions of law de novo. *Biermann*, 90 Wn. App. at 821. We may grant relief if the Board erroneously interpreted or applied the law, if the conclusions are not supported by the findings, or if the decision is inconsistent with an agency rule. *Clausing v. State*, 90 Wn. App. 863, 870, 955 P.2d 394, *review denied*, 136 Wn.2d 1020 (1998). This court may substitute its interpretation of the law for that of the Board. *Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991). Because the Board administers a special field of expertise, its statutory construction is accorded substantial weight. However, if our interpretation is contrary to that of the Board, it is our duty to declare the law. *Sellers*, 97 Wn.2d at 325-26.

■■■ *Statutory Construction*. Words used by the Legislature in different statutes governing the same subject matter are given the same meaning, unless the context dictates otherwise. *Garrison v. Washington State Nursing Bd.*, 87 Wn.2d 195, 197, 550 P.2d 7 (1976). The subject matter of this appeal includes the scope of the licensed practice of home health care, pharmacy, and registered nursing; the manufacture of pharmaceuticals; the regulation of controlled substances; and the definition of moral turpitude. The relevant statutes are RCW 70.127 (home health care), RCW 18.64 (pharmacists and manufacturers), former RCW 18.88 (registered nurses), RCW 69.41 (legend drugs and prescription drugs), and RCW 69.50 (controlled substances).

The associated administrative code sections are contained in WAC 246, which governs the Department of Health.

They include WAC 246-327 (home health care), WAC 246-856 through -865 (pharmacists and pharmaceutical services), WAC 246-839 (registered nurses), and WAC 246-887 (controlled substances).

We can find no coherent analysis to harmonize this Byzantine set of related regulations. We therefore examine each issue in light of the particular provisions that most directly apply.

*Scope.* We review the following conclusions of the Board: (1) Option Care Wenatchee was engaged in the practice of pharmacy; (2) it was thus subject to pharmacy regulations requiring a pharmacy license and the presence of a licensed pharmacist on the premises; (3) a separate controlled substance registration was required; (4) C.A.P.S. was manufacturing drugs without a license; and (5) Mr. Farina was guilty of moral turpitude.

The Board concluded its hearing in August 1994. Effective September 1994, new regulations restricted the authority of home health care agencies to prepare medications and TPNs. All references to statutes and regulations are to those in effect in January 1993, when the Board inspection disclosed the alleged violations.

ISSUES

1. Was the Wenatchee Option Care dispensing facility a pharmacy?

a. *Board's Power to Regulate.* The Board has some power under the Uniform Controlled Substances Act to regulate the dispensing of legend drugs and controlled substances by non-pharmacists. For example, RCW 69.41.075 permits the Board to pass rules regarding dispensing of legend drugs and RCW 69.50.301 empowers the Board to regulate the dispensing of controlled substances. However,

the Board may not restrict the scope of authorized practice of other licensed health professionals. RCW 18.64.255.[3]

The umbrella issue here, then, is not *could* the Board regulate the dispensing of drugs by home health care agencies during the relevant times, but *did* it.

b. *Practice of Pharmacy*. The Board concluded that Wenatchee was a pharmacy and that mixing, labeling and distributing drugs there was practicing pharmacy under the pharmacy licensing scheme of RCW 18.64. Mr. Farina did not obtain a pharmacy license as required by RCW 18.64.043. Board's Conclusion of Law 3.4.

The Board reasoned that RCW 18.64.020 makes it unlawful to practice pharmacy without a license. The statutory definition of "practice of pharmacy" includes dispensing drugs. Therefore, to dispense drugs is to practice pharmacy as a matter of law. RCW 18.64.011(11). Dispensing means to measure, compound, label and package drugs as necessary to prepare prescribed drugs for delivery. RCW 18.64.011(16). Mr. Farina concedes that Wenatchee Option Care was measuring, compounding, labeling, and packaging drugs as necessary to prepare prescribed drugs for delivery. Therefore, the Board concludes that Wenatchee Option Care was practicing pharmacy. We disagree.

*A pharmacist is not a practitioner under RCW 18.64*: Our dispositive holdings are based on the statutory definitions of key terms. First, it is important to distinguish the terms "practitioner" and "pharmacist" as used in the pharmacy licensing scheme. A "practitioner" is a doctor, nurse, or other person *authorized by law to prescribe drugs*. RCW 18.64.011(9). A "pharmacist" is *not* authorized to prescribe drugs. RCW 18.64.011(10), (11). A practitioner is, therefore, by definition, someone other than a pharmacist. Reading the regulations with this in mind, we are forced to conclude that a bare finding that the Wenatchee staff was dispensing

---

[3]"Nothing in [the pharmacy licensing scheme] shall operate in any manner:

"(1) To restrict the scope of authorized practice of any practitioner other than a pharmacist, duly licensed as such under the laws of this state[.]" RCW 18.64.255.

drugs does not support the conclusion that they were practicing pharmacy.

*Scope of regulations*: Until September 1994, the scope of licensed home health care practice expressly included parenteral product services. Former WAC 246-327-175. A home health care agency was allowed to prepare and mix TPNs and previously dispensed medications so long as it had written policies and procedures in place. Former WAC 246-327-175(2). The regulations explicitly authorized registered nurses to mix and reconstitute parenteral drugs when circumstances required. Former WAC 246-327--175(2)(a)(ii).

The RCW both explicitly and implicitly authorized non-pharmacists, including home health care practitioners, to dispense drugs. For instance, RCW 69.50.308(a) and (c)[4] authorized any practitioner licensed to *administer* controlled substances (i.e., a nurse) to dispense drugs. Home health care licensees were required to comply with RCW 69.41.030 and RCW 69.50.308—sections that authorized *nurses* (practitioners) to dispense controlled substances and legend drugs. RCW 70.127.130. Also, RCW 69.41.050 set forth requirements for labeling of drugs *dispensed by practitioners*.

Moreover, the WAC expressly provides for drugs to be lawfully dispensed in places other than pharmacies. For example, WAC 246-875-001 describes the medical record system required for all pharmacies *and other sites where the dispensing of drugs takes place.*

*Scope of nursing practice*: The Board asserts that the scope of registered nursing practice is limited to administering, not dispensing, drugs. The Board finds support for this view in WAC 246-839-710(1)(c) and (d).[5] Although these provisions do mention administering medications, we do not read the language as restrictive.

---

[4]To further confuse matters, both RCW 69.41 and 69.50 expressly include pharmacists within the definition of "practitioner." Former RCW 69.41.010(11)(a); former RCW 69.50.101(v)(1).

[5]Conduct that may be grounds for action against the nurse's license includes "[w]illfully or repeatedly failing to make entries, altering entries, destroying

c. *Subsequent Evolution of the Rules*. We agree with the Board that the recent trend, beginning with regulations that went into effect in September 1994, has been to bring all drug-related professional activities under the control of the Board of Pharmacy. But the Board found Mr. Farina violated the regulations in effect prior to the Wenatchee inspection on January 26, 1993. After the Farina disciplinary hearing, the broad authority of the Board to regulate home health care was made explicit. Former WAC 246-327--175's authorization for home health care agencies to prepare TPNs was repealed effective September 22, 1994. State Register 94-17-136 (Sept. 7, 1994). And since 1995, every health care entity including home health agencies must be licensed by the Board to buy, administer, dispense, or deliver controlled substances. RCW 18.64.450(2), enacted by Laws of 1995, ch. 319, § 3. However, none of these current WACs is retroactive. *City of Ellensburg v. King Videocable Co.*, 80 Wn. App. 901, 912, 912 P.2d 506, *review denied*, 129 Wn.2d 1028 (1996); *In re Personal Restraint of Shepard*, 127 Wn.2d 185, 193, 898 P.2d 828 (1995).

Wenatchee Option Care complied with the home health care regulations in force until their repeal in 1994 formalized the Board's oversight over the industry. We conclude that the Board's findings do not support its conclusion that the dispensing facility was required to be licensed by the Board under the applicable regulations.

2. Was the physical presence of a licensed pharmacist required at the Wenatchee facility?

Even if we were to accept the Board's characterization of the Wenatchee dispensing as the practice of pharmacy, we reject the Board's proposed definition of "supervision" as requiring the physical presence of a licensed pharmacist on the premises.

The Board concluded that Wenatchee Option Care

---

entries, making incorrect or illegible entries and/or making false entries in records pertaining to the giving of medication, treatments, or other nursing care" and "[w]illfully or repeatedly failing to administer medications and/or treatments in accordance with policy and procedure." WAC 246-839-710(1)(c), (d).

violated RCW 18.64.250 by dispensing legend drugs and controlled substances without the *presence and supervision* of a licensed pharmacist. Board's Conclusion of Law 3.3.

RCW 18.64.250(2) makes it a misdemeanor to permit the compounding and dispensing of prescriptions, except under the *supervision* of a licensed pharmacist. RCW 18.64.250 is a criminal statute, and as such must be strictly construed. *State v. Fitzpatrick*, 5 Wn. App. 661, 666, 491 P.2d 262 (1971), *review denied*, 80 Wn.2d 1003 (1972). We find nothing in the regulations to suggest the Legislature required a pharmacist to be present on-site at every home health care branch agency.

Where supervision requires presence, the regulations unambiguously say so. Authorized home health services expressly included pharmacy services during the times relevant here. Former WAC 246-327-010(20)(*l*).[6] Nurses were expressly authorized to mix drugs in the preparation of TPNs. Former WAC 246-327-175(2)(a)(ii). If the mandatory presence of a licensed pharmacist were contemplated, we would expect to find that language here. But clinical nursing services, including preparation and administration of drugs, were to be supervised by a *registered nurse*. Former WAC 246-327-125(1)(a), (e); former WAC 246-327-145(3).[7] The only reference to supervision by a licensed pharmacist in WAC 246-327 was for preparing labels. Former WAC 246-327-175(2)(a)(ii)(B).

Other examples of the specific use of the term "supervision" include: Unlicensed persons may not practice pharmacy except in the *presence and under the immediate supervision* of a licensed pharmacist. Former RCW 18.64.160(10). Pharmacy interns may not practice pharmacy except under the *direct and personal* supervision of a

---

[6]Former WAC 246-327-010(20) provided that home health services include: "(a) Nursing services; . . . (g) Nutritional services; . . . (*l*) Pharmacy services." Effective September 1994, the entire definitional listing of home health services was dropped from the WAC. The RCW definition of home health services never included pharmacy. RCW 70.127.010(6).

[7]By comparison, home health therapy assistants must be supervised by a licensed therapist. Former WAC 246-327-155(3)(b).

licensed pharmacist. WAC 246-858-040(2). No more than a single pharmacy intern may "dispense concurrently under the *direct* supervision of the same preceptor." WAC 246--858-070(5) (emphasis added). The clinical supervision of osteopathic acupuncture assistants must be *direct*; the instructor *must be in the room* during treatment and *in the facility* afterwards. WAC 246-855-030(4).

Moreover, drug dispensing sometimes expressly does *not* require the presence of a licensed pharmacist. For instance, either a staff pharmacist *or an off-site* consultant "supervises the entire spectrum of pharmaceutical services" in an extended care facility. WAC 246-865-060(1)(b). These services include the storage and preparation of drugs and controlled substances. WAC 246-865-050.

Given the precision with which the health care regulatory scheme defines "supervision" in the above examples, supervision of home health care agencies should be given the definition of the home health care regulations. The plain language does not require presence. " 'Supervision' means authoritative procedural guidance by a qualified person who assumes the responsibility for the accomplishment of a function or activity and who provides direction and ongoing monitoring and evaluation of the actual act of accomplishing the function or activity." Former WAC 246-327-010(41). "Monitoring" and "evaluation" are not defined, so we give them their common, dictionary meaning. To "monitor" means to give advice or instruct regarding conduct; to "evaluate" means to appraise or rate. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1460, 786 (1969).

We conclude that on-site supervision by a pharmacist was not required.

3. Was a separate controlled substances registration required at Wenatchee Option Care?

The Board concluded that Wenatchee Option Care was required to be registered under RCW 69.50.302(a), (e) and WAC 246-887-020(3), the controlled substance registration provisions. Board's Conclusion of Law 3.5. We disagree.

*Pharmacists are Practitioners for RCW 69.50.* In turning from the pharmacy and home health care regulatory scheme of RCW 18.64 and WAC 246 to the controlled substances provisions of RCW 69.50, we must switch definitional horses. There is an important difference. The term "practitioner" as used in RCW 69.50 is much more inclusive. Both nurses and pharmacists—as well as pharmacies—are "practitioners" for the purposes of controlled substances legislation. Former RCW 69.50.101(v).[8]

■ ■ We conclude that both nurses and pharmacists are exempt from the registration requirements by RCW 69.50.302(d): *"Personal practitioners* licensed or registered in the state of Washington under the respective professional licensing acts shall not be required to be registered under this chapter unless the specific exemption is denied pursuant to RCW 69.50.305 for violation of any provisions of this chapter." (Emphasis added.)

Personal, as in *personal practitioner,* is not defined in RCW 69.50. But "person" is defined. It includes an individual, corporation, partnership, association, agency, or any other legal or commercial entity. Former RCW 69.50.101(t). We conclude that a "personal practitioner" is either "a person who is a practitioner" or "a practitioner with respect to persons." In either case, Mr. Farina and Wenatchee Option Care were personal practitioners, and thus exempt from the registration requirements.

4. Was C.A.P.S. manufacturing drugs?

The Board imposed penalties on C.A.P.S. under RCW 69.50.401(a) for manufacturing drugs without a license or registration.

C.A.P.S. repackaged and relabeled commercially obtained

---

[8] 'Practitioner' means:

"(1) A physician . . ., registered nurse . . ., licensed practical nurse . . ., a pharmacist . . . insofar as is consistent with those licensing laws to distribute, dispense, . . . or administer a controlled substance in the course of their professional practice . . . .

"(2) A pharmacy . . . ." Former RCW 69.50.101(v).

drugs for its institutional customers. The Board concluded that these services fell within the definition of manufacturing in RCW 18.64.011(20). Therefore, the Board determined that C.A.P.S. needed both a license under the manufacturer's licensing provisions of RCW 18.64.045, and a controlled substances registration as a manufacturer under RCW 69.50.302(a). Board's Conclusions of Law 3.6 and 3.7.

The question here is whether the activities of C.A.P.S. fell under the statutory definition of manufacturing. We conclude they did not.

■ Again, we are faced with two statutes regulating the same subject matter, each with a different definition of a key term, in this case "manufacture." RCW 18.64.011(20) and former RCW 69.50.101(o).[9] Whenever possible, statutes should be read as complementary. *In re Estate of Kerr*, 134 Wn.2d 328, 337, 949 P.2d 810 (1998).

■ *RCW 69.50*: The controlled substances act defines drug manufacture as the production, preparation, or *compounding* of a drug from substances of natural origin, or by means of chemical synthesis. It includes any packaging or repackaging, labeling or relabeling of *the substance* or its container. "Compounding" here means no more than its common dictionary meaning of "combining."[10]

■ RCW 69.50 explicitly excludes packaging or labeling of drugs *by a practitioner*. Former RCW 69.50.101(o)(1). As distinct from the pharmacy regulations, however, "practitioner" as used in RCW 69.50 includes both individual pharmacists and pharmacies. Former RCW 69.50.101(v)(1), (2). By definition, then, a pharmacy is expressly excluded from the ranks of manufacturers. A pharmacy that repackages and relabels drugs in the course of its professional

---

[9]Currently RCW 69.50.101(p).

[10]The word "compound" is undefined in RCW 69.50, and we therefore take the ordinary meaning. *State v. Chester*, 133 Wn.2d 15, 22, 940 P.2d 1374 (1997). The common meaning of "compound" is "to combine." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 466 (1969).

practice, as C.A.P.S. does, is not manufacturing. Therefore, the controlled substance registration and penalty provisions of RCW 69.50 clearly do not apply.

*RCW 18.64*: The definition of manufacture in the pharmacy licensing statute, RCW 18.64, is almost but not quite identical. Because of the different definitions of "compounding" and "practitioner," however, the differences are crucial.

Manufacture for the purposes of RCW 18.64 also includes the production, preparation, and compounding of drugs. This definition, though, contains no reference to preparation from natural substances or chemical synthesis. RCW 18.64.011(20). Therefore all compounding of drugs is manufacturing. Unfortunately, unlike RCW 69.50, RCW 18.64 does define "compounding." It is the act of combining two or more ingredients *in the preparation of a prescription*. RCW 18.64.011(18). Thus defined, compounding is an activity that only pharmacists do. If we take the statute at face value, therefore, every corner drugstore pharmacist is a manufacturer.

RCW 18.64's definition of manufacture also contains an exception for practitioners incident to their professional practice. RCW 18.64.011(20). As previously noted, however, the definition of "practitioner" in RCW 18.64 excludes pharmacists. Consequently, pharmacists are excluded from the exception. Pharmacists are therefore left squarely within the definition of manufacturers.

▮ Fortunately, RCW 18.64.011 qualifies its definitions with the saving language, "[u]nless the context clearly requires otherwise . . . ." Here, the context clearly does require otherwise to avoid absurdity. *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979). By incorporating both RCW 69.50's common usage of "compound" and its inclusive definition of "practitioner" into RCW 18.64.011(20), nonproducing pharmacists and pharmacies are beyond the scope of the definition of "manufacturers."

The Board argues that, because C.A.P.S.'s customers were health care entities rather than individuals, it was not a

pharmacy. This proposition is not supported by authority, and is contrary to the Board's own findings that C.A.P.S. is a pharmacy. Board's Findings of Fact 2.1, 2.11.

C.A.P.S. did not violate the manufacturer's licensing or registration regulations.

5. Is Mr. Farina guilty of moral turpitude?

The Board concluded that Mr. Farina knowingly violated the law and, therefore, violated former RCW 18.64.160(9).[11] The Board further characterized Mr. Farina's conduct as dishonesty constituting moral turpitude and unfitness to practice the profession. It therefore imposed sanctions under the moral turpitude provision of former RCW 18.64.160(3). Board's Conclusions of Law 3.10 and 3.11. We disagree.

The definition of moral turpitude does not encompass merely technical and unwitting violations. It is an act of "baseness, vileness, or the depravity in private and social duties which man owes to his fellow man[.]" It is to be "distinguished from statutory mala prohibita." BLACK'S LAW DICTIONARY 1008 (6th ed. 1990).

Under Washington's Uniform Disciplinary Act, this means "conduct indicating unfitness to practice the profession." *Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 742, 818 P.2d 1062 (1991). The decisions reserve "moral turpitude" for such egregious conduct as sexual misconduct with patients or clients. *E.g., Heinmiller v. Department of Health*, 127 Wn.2d 595, 903 P.2d 433, 909 P.2d 1294 (1995) (social worker's sex with patient), *cert. denied*, 518 U.S. 1006 (1996); *Haley*, 117 Wn.2d 720 (physician's sex with teenage former patient). The meaning relies on the "common knowledge of members of the particular vocation[.]" *Haley*, 117 Wn.2d at 742. Even violation of a criminal stat-

---

[11]The Board shall have the power to refuse, suspend, or revoke the license of any pharmacist or intern upon proof that "[h]e or she has knowingly violated or permitted the violation of any provision of any state or federal law, rule, or regulation governing the possession, use, distribution, or dispensing of drugs, including, but not limited to, the violation of any provision of this chapter, Title 69 RCW, or rule or regulation of the board[.]" Former RCW 18.64.160(9).

ute does not necessarily involve moral turpitude, and the statute must be examined for inherent immorality. *In re Kindschi*, 52 Wn.2d 8, 12-13, 319 P.2d 824 (1958).

The Board cites the fact Mr. Farina told the Wenatchee staff they were operating under the Yakima license as proof of intent to deceive. Until September 1994, the home health care regulations included the following definition:

> "Branch office" means a location or site from which an agency provides services within a portion of the total geographic area served by the parent agency. The branch office is part of the agency, included in the license of the agency, and located sufficiently close to share administration, supervision, and services.

Former WAC 246-327-010(7). In September 1994, the phrase "included in the license of the agency" was dropped. Before that, it was not dishonest to say Wenatchee Option Care was operating as an extension of Pharmaco and under its license. It was Pharmaco's home health care license, though, not its pharmacy license, that was operative.

The Wenatchee Option Care inspection was not a surprise visit. Nevertheless, no attempt was made to conceal drugs or equipment, or to remove signs from the walls. In fact, the staff was "very proud" of their facility at the time of the inspection.

Mr. Farina ran afoul of a Byzantine regulatory scheme. The Board therefore charges him with deliberate dishonesty. The record does not support this view. The record does not support a finding that Mr. Farina attempted to deceive either the Board's inspector or his own employees as to what he was doing, or his understanding of the rules. The conduct described in the record is consistent with a good faith effort to apply incongruent or overlapping regulations to a developing health care field in a manner consistent with optimally serving patients with unconventional needs. That is not moral turpitude.

We agree with the superior court that the overlapping statutes are particularly susceptible to misinterpretation,

and any violation was merely technical. Nothing in the record supports the view that Mr. Farina intentionally flouted the law or that he deliberately broke the rules without regard for public safety.

 *Lot numbers*: In addition to the Wenatchee Option Care and C.A.P.S. dispensing activities, the Board found evidence of moral turpitude in C.A.P.S.'s failure to include manufacturers' lot numbers on the labels of repackaged drugs. On examination of the rules, we find that lot numbers are not required on labels, provided an audit trail exists.

The WAC specifies in detail the information that must appear on parenteral product labels. This does not include lot numbers. WAC 246-871-050(3)(a). Also, all pharmacies and other sites where the dispensing of drugs takes place[12] are required to maintain a patient profile or medication record system. WAC 246-875-001. This system may omit lot numbers, if there is a return policy for recalled products. WAC 246-871-050(2)(n). The manufacturer's lot number is not required so long as there is an "audit trail." WAC 246-875-001.

We conclude that the Board's finding that lot numbers were omitted does not establish a technical violation, much less moral turpitude.[13]

---

[12]The WAC regulates places other than pharmacies where the dispensing of drugs takes place. The WAC itself thus refutes the Board's argument that a place where drugs are dispensed is per se a pharmacy.

[13]We note that the RCWs and WACs governing actions against home health care licenses provide for notice and opportunity to comply. The Board moved against Mr. Farina's pharmacy license, not his home health care license, although it was the operation of his home health agency it found deficient. Notice and time to comply are not, therefore, technically required. However, these due process considerations suggest the Legislature anticipated good faith technical violations in a new field of health care incorporating elements of several heavily regulated related fields.

Mr. Farina immediately complied with every suggestion by the Board. When it suggested he get a manufacturer's license, he applied immediately, even though

## CONCLUSION

We affirm the superior court's reversal of the Board's conclusions of law 3.3, 3.10 and 3.11 and the superior court's reversal of paragraphs 4.1, 4.2 and 4.3 of the order of the Board. We reverse the superior court's affirmance of the Board's conclusions of law 3.4, 3.5, 3.6 and 3.7 and the superior court's affirmance of paragraphs 4.4 and 4.5 of the order of the Board. We therefore conclude that the Board's order suspending the licenses of Joseph Farina, C.A.P.S., and Option Care should be reversed.

SCHULTHEIS, C.J., and KATO, J., concur.

Reconsideration granted and opinion modified April 13, 1999.

he questioned the necessity. After the Wenatchee Option Care inspection, he immediately ceased dispensing and shipped all drugs back to Yakima. Nothing in the record suggests that the Board's stated goal of protecting the public could not have been achieved informally.