[No. 24473-3-III.   Division Three.   April 26, 2007.]

MELANIE S. LANG ET AL., *Appellants*, v. THE DENTAL QUALITY ASSURANCE COMMISSION ET AL., *Respondents*.

236

*John C. Versnel III* and *Vanessa Vanderbrug* (of *Lawrence and Versnel, PLLC*), for appellants.

*Robert M. McKenna, Attorney General*, and *Susan L. Pierini* and *Steven T. Skelton, Assistants*, for respondents.

¶1 KULIK, J. — Dr. Melanie Lang and Dr. Mark Paxton own a surgical practice and perform cosmetic and dental surgeries that require patients to be under general anesthesia. Dr. Lang is both a licensed medical doctor and a licensed dentist. Dr. Paxton is a licensed dentist. Following a complaint to the Department of Health (Department), the Dental Quality Assurance Commission (Dental Commission) and the Medical Quality Assurance Commission (Medical Commission) each charged the doctors with allowing unlicensed employees to start intravenous (IV) lines and administer general anesthetic in violation of RCW 18.130.180(7) and (10). After a contested hearing, the Commissions' presiding officer found by clear and convincing evidence that Drs. Lang and Paxton violated the statutes, imposed sanctions of a $5,000 fine, and issued orders to cease and desist. The superior court affirmed the Commissions' final orders.

¶2 On appeal, Drs. Lang and Paxton assert the Commissions' presiding officer erred by (1) concluding that the doctors allowed unlicensed assistants to start IVs and administer general anesthetic in violation of RCW 18.130.180(7) and (10); and (2) by imposing sanctions for the violations. The doctors also assert a number of procedural errors.

¶3 We conclude that the Commissions' presiding officer did not err by concluding that the doctors violated the statute by allowing unlicensed employees to start IVs and administer general anesthetic. We further conclude that the sanctions imposed were not arbitrary or capricious. We affirm.

## FACTS

¶4 Dr. Mark C. Paxton is licensed to practice dentistry in Washington. Dr. Melanie Lang holds a dental license and a medical license in Washington. Both doctors are subject to RCW 18.130.180 of the Uniform Disciplinary Act. At the time of the complaint and investigation, Dr. Paxton served as a member of the Dental Commission.

¶5 Dr. Lang and Dr. Paxton own Spokane Oral and Maxillofacial Surgery Associates, an office-based surgical practice in Spokane. Drs. Lang and Paxton perform surgeries, including cosmetic and dental surgery, that require the patients to be under general anesthesia.

¶6 In February 2003, a former employee of Drs. Lang and Paxton filed a complaint with the Department alleging that Drs. Lang and Paxton allowed unlicensed employees to start IV lines and administer anesthetic both in and out of the doctors' presence. During the investigation of the complaint, both Dr. Lang and Dr. Paxton admitted that they employed unlicensed assistants to start IVs and give anesthetic during surgery.

¶7 The Dental Commission and Medical Commission each filed a statement of charges against Dr. Lang. The Dental Commission also filed charges against Dr. Paxton. The matters were consolidated for hearing.

¶8 The Commissions delegated final decision-making authority to a presiding officer. During the administrative hearing, Drs. Lang and Paxton again admitted that they employed individuals, who were unlicensed by the State of Washington, to start IV lines and give anesthetic. The doctors referred to these employees as "surgical assistants." Administrative Record (AR) at 1892.

¶9 The surgical assistants' duties included administering anesthetic, including Propofol and Versed. The surgical assistants put the IV catheter into the patient's arm, drew the anesthetic out of a vial into a syringe with a needle attached, inserted the needle into the patient's IV port, and then pushed the anesthetic into the IV.

¶10 Patricia Rathbun-Gibson was a surgical assistant for Drs. Lang and Paxton. She attended a dental-assisting program at Apollo College. Ms. Rathbun-Gibson explained that after getting the patient hooked up to monitors, the surgical assistants started the IV before the doctors came into the room. She testified that the surgical assistants put the IV catheter into the patient's arm and would hook up the IV bags. Ms. Rathbun-Gibson was not licensed.

¶11 Ms. Rathbun-Gibson had given patients Propofol at the direction of a doctor. Ms. Rathbun-Gibson gave the medication by putting it into the IV line. On 5 to 10 occasions, Ms. Rathbun-Gibson gave Propofol when the doctor was not in the room.

¶12 Kim Colt stated that she worked as a surgical assistant for both doctors. When she started the IV or administered a general anesthetic, a doctor would usually be in the room, but not always. Ms. Colt explained that, when there was a long surgical case, the doctor might leave the room to see other patients. The doctor would then ask the surgical assistants to continue administering the general anesthetic until the doctor returned. Danielle Cain, another surgical assistant, stated that she drew up a general anesthetic and pushed it in the IV port under the supervision of a doctor. Neither Ms. Colt nor Ms. Cain was licensed.

¶13 Katrina Soliday is a registered nurse who was employed at Spokane Oral and Maxillofacial Surgery Associates for several months. During that time, she assisted both doctors and observed over 100 surgeries where she saw unlicensed surgical assistants draw up general anesthetics from vials and push them through the patients' IV ports. Ms. Soliday testified that on one occasion she heard

Dr. Lang ask the surgical assistant to give "2.5 of Versed." AR at 2052. The assistant drew up 2.5 cubic centimeters of Versed, five times more than the intended dose of 2.5 milligrams. Dr. Lang noticed the error and the surgical assistant did not put the excessive dose into the IV port.

¶14 Ms. Cain prepared an office policy statement for an Occupational Safety and Health Administration review, which stated:

> On a normal surgery day, we see approximately 10-14 general anesthetic patients. Us [sic] as surgical assistants need to make sure the drugs are getting *administered* correctly to the patients. During a general anesthetic procedure we already use fentanyl, versed, decadron and propofol. Any time we *administer* any of these drugs we <u>must always</u> check with the doctor on how much to *give* the patient, and the doctor <u>must always</u> be present. Patients vary and if you *give* too much to the wrong patient it could end up bad.

AR at 2329 (italics added).

¶15 The Commissions' presiding officer found that Drs. Lang and Paxton violated RCW 18.130.180(7) by violating WAC 246-817-540(4). This regulation prohibits dentists from allowing unlicensed persons to conduct any administration of general anesthetic in connection with a dental operation. The Commissions' presiding officer also determined that Dr. Paxton and Dr. Lang violated RCW 18-.130.180(10) by allowing their assistants to start IV lines and administer anesthetics. The Commissions' presiding officer imposed sanctions of $5,000 against each doctor and entered a cease and desist order on January 13, 2005.

¶16 Dr. Paxton and Dr. Lang appealed the Commissions' presiding officer's orders. The superior court affirmed the orders. This appeal follows.

## STANDARD OF REVIEW

¶17 The Administrative Procedure Act (APA) governs judicial review of agency decisions. Ch. 34.05 RCW. The burden of demonstrating the invalidity of agency action is on the party challenging the action. RCW 34.05.570(1)(a).

¶18 Under RCW 34.05.570(3)(e), the agency's order is reviewed under the substantial evidence test. In a medical disciplinary proceeding, the standard is "clear and convincing evidence." *Bang D. Nguyen v. Dep't of Health*, 144 Wn.2d 516, 518, 29 P.3d 689 (2001).

¶19 This court engages in de novo review of an agency's legal conclusions. *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325, 646 P.2d 113 (1982). In cases where the agency is interpreting the law it administers, courts give substantial weight to the agency's interpretation. *Renton Educ. Ass'n v. Pub. Employment Relations Comm'n*, 101 Wn.2d 435, 443, 680 P.2d 40 (1984). And courts will give substantial weight to the agency's interpretation of its own rules. *Federated Am. Ins. Co. v. Marquardt*, 108 Wn.2d 651, 656, 741 P.2d 18 (1987).

## ANALYSIS

### *Procedures Performed by Unlicensed Assistants*

#### ADMINISTRATION OF ANESTHETIC

¶20 RCW 18.130.180(7) defines "unprofessional conduct" as:

> Violation of any state or federal statute or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice.

The rules promulgated by the Dental Commission contain prohibitions against certain acts by unlicensed persons. WAC 246-817-540. Specifically, WAC 246-817-540 provides:

> No dentist shall allow an unlicensed person who is in his/her employ or *is acting under his/her supervision or direction to perform any of the following procedures:*
>
> . . . .
>
> (4) Any *administration* of general or injected local anesthetic of any nature in connection with a dental operation.

(Emphasis added.)

¶21 At the hearing, witnesses testified that the surgical assistants started IVs on patients and gave anesthetic through IVs. The Commissions' presiding officer found that the "surgical assistants were administering general anesthetics during surgery, when they drew up the general anesthetic out of a vial with a syringe, pushed the general anesthetic through the patient's IV port and sent it into the patient's veins." AR at 1918.

¶22 Drs. Lang and Paxton contend that the word "administration" in WAC 246-817-540(4) means the "control over" or "management of" the delivery of general anesthetic to a patient. In their view, the surgical assistants merely "delivered" the general anesthetic to the patients while Drs. Lang or Paxton "administered" the anesthetic by supervising the surgical assistants.

¶23 The meaning of a statute is a question of law that is reviewed de novo. *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001). When a statute's meaning is plain on its face, the court must give effect to that plain meaning as an expression of legislative intent. *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001). The plain meaning is ascertained from an examination of the statute as a whole and from related statutes that reveal legislative intent concerning the provision in question. *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999). A statute is ambiguous if it can be interpreted in more than one way. *Weyerhaeuser v. Tacoma-Pierce County Health Dep't*, 123 Wn. App. 59, 66, 96 P.3d 460 (2004). Courts must avoid readings of statutes that result in absurd or strained consequences. *Glaubach v. Regence BlueShield*, 149 Wn.2d 827, 833, 74 P.3d 115 (2003).

¶24 To accept the doctors' argument, the court must conclude that the term "administration" in WAC 246-817-540(4) is ambiguous. But reading the regulation as a whole, the term is not ambiguous. The regulation expressly prohibits dentists from allowing unlicensed persons, even if supervised, to perform *any* administration of general anesthetic of *any* nature. WAC 246-817-540(4).

¶25 WAC 246-817-540(4) lists the "procedures" that are prohibited, and one of those procedures is "[a]ny administration of general or injected local anesthetic." The plain language of the regulation provides that "administration" of anesthetic is prohibited by an unlicensed employee even if that employee is under the supervision or direction of the dentist. Moreover, a plain reading of the regulation does not support the doctors' argument that the word "administration" means the supervision by a doctor of the entire process of giving anesthetic rather than the procedure of delivering anesthetic.

¶26 Drs. Lang and Paxton contend that the presiding officer's reading of WAC 246-817-540(4) ignored the testimony of experts who stated that the term "administration" was a specialized term within the field of oral and maxillofacial surgery. For example, Dr. Gary Maxwell, an oral and maxillofacial surgeon, testified: "to me, the only person administering the anesthetic as the captain of the ship is the person that's responsible for the anesthetic and is directing people to do ancillary actions." AR at 2142. Dr. DeAnn Isackson, an anesthesiologist, testified that the administration is a combination of events and reactions that are part of a continuous process.

¶27 The expert testimony presented by Dr. Lang and Dr. Paxton fails to establish that the word "administration" is a specialized term that encompasses only the work of the supervising physician. And it contradicts the employees' testimony that they administered anesthetic by pushing a needle into an IV port.

¶28 In summary, the meaning of the word "administration" in WAC 246-817-540(4) can be determined from the regulation itself. "Administration" is not a specialized term. The plain language of the provision provides that an unlicensed employee cannot perform the procedure of administering anesthetic. The reading suggested by Drs. Lang and Paxton is strained. The Commissions' presiding officer did not err by concluding that Drs. Lang and Paxton violated WAC 246-817-540(4).

LICENSE REQUIREMENTS

¶29 The Commissions' presiding officer concluded that Drs. Lang and Paxton violated RCW 18.130.180(10), which defines "unprofessional conduct" as "[a]iding or abetting an unlicensed person to practice when a license is required."

¶30 By reviewing health care provider regulations, the Commissions' presiding officer determined which providers are authorized to start IVs and give anesthetic.

¶31 Conclusion of law 2.13 states:

[T]he Presiding Officer *reviewed regulations of individuals that are licensed and are permitted to administer medications or pierce human tissue (start IVs) in the course of providing health care.* Under a physician's direction, registered nurses can administer prescribed drugs or provide treatment involving piercing of the tissue. RCW 18.79.280. Under more limited restrictions and supervision, a licensed practical nurse may administer medications or, under certain circumstances, start IVs. RCW 18.79.270. Surgical technicians, who must be credentialed with the Department (RCW 18.215.020), are not allowed to penetrate human tissue or dispense medications. WAC 246-939-050. Health Care Assistants (HCA), who are required to have a credential from the Department, have similar restrictions regarding the scope of their practice. RCW 18.135.010. HCAs can withdraw blood and give shots, but there is no authority to start IVs. WAC 246-826-100. The rules provide that no HCA may start an IV—only stop and restart under limited conditions. WAC 246-826-210(1) and (2).

AR at 1918-19 (emphasis added).

¶32 Drs. Lang and Paxton argue that these statutes do not require a license for an assistant who is merely "starting an IV." Drs. Lang and Paxton contend that there is insufficient evidence to support a finding that "starting IV lines" is the same as piercing tissue. But there is no finding to this effect. Instead, Drs. Lang and Paxton are apparently referring to the Commissions' presiding officer's explanation in his conclusion of law that he reviewed the regula-

tions applying to individuals licensed to administer medication or pierce tissue and start IVs.

¶33 Here, the doctors repeat their argument that their surgical assistants are authorized to start IVs and give general anesthetic because no statutory or regulatory provision prohibits this activity. But to accept their argument, the Commissions' presiding officer, and this court, would have to ignore the responsibility of health care providers to ensure that only properly licensed employees provide certain types of patient care. The doctors' argument would essentially allow anyone to start IVs.

¶34 The Commissions' presiding officer did not err by concluding that the doctors allowed unlicensed assistants to perform procedures requiring a license.

### *Applicable Standard of Evidence*

¶35 The Commissions' presiding officer evaluated the charges and the sanctions against Dr. Lang and Dr. Paxton under both the clear and convincing evidence standard and the preponderance of evidence standard. At the hearing, the presiding officer noted that the appellate courts were then split on which standard applied to other disciplines. The appellate courts applied the preponderance of the evidence standard to such disciplines as real estate appraisers, certified nursing assistants, and registered engineers. *See Eidson v. Dep't of Licensing*, 108 Wn. App. 712, 720-21, 32 P.3d 1039 (2001); *Ongom v. Dep't of Health*, 124 Wn. App. 935, 945, 104 P.3d 29 (2005), *rev'd*, 159 Wn.2d 132, 148 P.3d 1029 (2006), *cert. denied*, 127 S. Ct. 2115 (2007); *Nims v. Bd. of Registration*, 113 Wn. App. 499, 505, 53 P.3d 52 (2002).

¶36 After the hearing in this matter, the Washington Supreme Court settled the controversy by concluding that due process required clear and convincing proof in professional license disciplinary proceedings. *Ongom*, 159 Wn.2d at 134.

¶37 Drs. Lang and Paxton contend that the Commissions' presiding officer, by evaluating the evidence and the

request for sanctions against their licenses under two different standards of proof, violated their right to notice of what standard would apply. But the burden was on the Department to meet the higher standard. The critical point is that the presiding officer applied the clear and convincing standard in his decision. The presiding officer did not err by considering two standards of proof because he ultimately found the violations were supported by clear and convincing evidence.

¶38 More importantly, Drs. Lang and Paxton fail to show how they were prejudiced by the application of two standards of proof. They admit that they employed unlicensed surgical assistants who started IVs and gave general anesthetic. Similarly, Drs. Lang and Paxton fail to present any evidence demonstrating that the presiding officer did not apply the clear and convincing standard. In the judicial review of an agency action, "[t]he court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d). The doctors have not established any prejudice.

¶39 The Commissions' presiding officer did not err by considering the clear and convincing standard and the preponderance of the evidence standard in connection with Dr. Lang's medical license and dental license, and Dr. Paxton's dental license.

## PROCEDURAL ISSUES

### *Determination of Merit*

¶40 The Department received a complaint concerning Drs. Lang and Paxton on February 3, 2003. The Dental Commission applied its written threshold policy and the complaint was assigned to an investigator. Drs. Lang and Paxton contend that all of the Dental Commission's subsequent actions were void because the Department's initial investigation of the complaint constituted an action in excess of the Department's statutory authority. The doctors

argue that the investigation could not proceed absent a determination as to the merit of the complaint.

¶41 RCW 18.130.050 establishes the *authority* of the disciplining body. RCW 18.130.050(2) reads, in part, that the disciplining authority has *the authority to "investigate all complaints* or reports of unprofessional conduct as defined in this chapter and to hold hearings as provided in this chapter." (Emphasis added.) A "disciplining authority" is "the agency, board, or commission having the authority to take disciplinary action against a holder of, or applicant for, a professional or business license upon a finding of a violation of this chapter or a chapter specified under RCW 18.130.040." RCW 18.130.020(1).

¶42 Former RCW 18.130.080 (1998) discusses the filing and investigation of complaints and reads, in part, as follows:

If the disciplining authority determines that the complaint merits investigation, or if the disciplining authority has reason to believe, without a formal complaint, that a license holder or applicant may have engaged in unprofessional conduct, the disciplining authority *shall investigate* to determine whether there has been unprofessional conduct.

(Emphasis added.)

¶43 Drs. Lang and Paxton assert that *Client A v. Yoshinaka*, 128 Wn. App. 833, 116 P.3d 1081 (2005) requires this court to void the disciplinary action taken by the Commissions. In *Yoshinaka*, the Department received a complaint against a licensed psychologist and began an investigation without a determination of complaint merit. *Id.* at 836-37. When the Department made a request for patient treatment records, the psychologist objected and asked for some indication of probable cause. The Department renewed its request but later closed the complaint, finding no violation. *Id.* at 838. The psychologist then filed a motion for declaratory and injunctive relief, arguing that the Department's request for patient records constituted an unreasonable search and seizure. *Id.* at 839. The trial court

dismissed the petition on summary judgment and the psychologist appealed. *Id.*

¶44 On appeal, the court recognized that the case was moot but concluded that review should be granted. The court resolved the matter under RCW 18.130.080. The court read RCW 18.130.080 to provide that: "If the Board receives a complaint against a psychologist, it *may* investigate that complaint if it 'determines that the complaint merits investigation.'" *Yoshinaka*, 128 Wn. App. at 843 (emphasis added and omitted) (quoting RCW 18.130.080). Based on this reading, the court concluded that the Department's action violated RCW 18.130.080. The court reversed the trial court's decision in favor of the Department. *Yoshinaka*, 128 Wn. App. at 844-45.

¶45 Here, the doctors did not raise the issue of predetermination of merit at the administrative hearing or in superior court. The Department contends that the issue of a predetermination of merit cannot be raised for the first time on appeal pursuant to RCW 34.05.554 and RAP 2.5(a). The Department also argues that the Dental Commission's complaint threshold determination makes the determination of merit required under *Yoshinaka*. The threshold policy, effective in 1996, provides a preinvestigation determination of the merit of the complaints.

¶46 *Yoshinaka* had not been decided when Drs. Lang and Paxton's hearing was held before the Commissions' presiding officer. The Commissions' presiding officer's orders in this matter were issued on January 13, 2005. The *Yoshinaka* decision was issued on August 8, 2005, and amended on September 16, 2005.

¶47 Judicial review of a final decision of an administrative agency is limited by the provisions of the APA. *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 322, 646 P.2d 113 (1982). RCW 34.05.554 provides that, generally, new issues may not be raised for the first time on appeal. Exceptions to this rule are set forth in RCW 34.05.554. One of these exceptions allows a new issue to be

raised when there has been a change in "controlling law" after agency actions. RCW 34.05.554(1)(d)(i).

¶48 Under the circumstances here, *Yoshinaka* was not a change in controlling law. *Yoshinaka* simply held that the Board of Psychology had not followed RCW 18.130.080, which requires the disciplining authority to make a merit determination before an investigation is commenced. Simply stated, *Yoshinaka* applied a still-existing statute and found a violation. As a result, the issue concerning the Commissions' determination of merit cannot be raised for the first time on appeal.

### *Dr. Lang's Medical License*

¶49 Dr. Lang argues that the Medical Commission cannot file a statement of charges for violations of regulations pertaining to her dental practice. Dr. Lang maintains that the statement of charges is outside the Medical Commission's jurisdiction because it describes Dr. Lang as an oral surgeon, and because the conduct involved dental, not medical, treatment. Dr. Lang further asserts that the Medical Commission had no jurisdiction to decide whether she had violated these provisions.

¶50 The Medical Commission's statement of charges alleged that Dr. Lang is a licensed physician and that she used surgical assistants who were not licensed, certified, or registered in Washington. The statement of charges does not reference dental rules or conduct, and the statement of charges does not contain evidence indicating that the unlicensed assistants were used only for dental procedures. Significantly, these assistants could have been used in both her medical practice and her dental practice. Of equal importance, the statement of charges alleged a violation of RCW 18.130.180, a provision applicable to physicians. And, in *Haley v. Medical Disciplinary Board*, 117 Wn.2d 720, 818 P.2d 1062 (1991), a physician was disciplined for sexual conduct that was outside his medical practice.

¶51 Here, the Medical Commission had jurisdiction to issue a statement of charges against Dr. Lang pursuant

to RCW 18.130.020(1), RCW 18.130.040(2)(b)(ix), RCW 18-.130.050, and RCW 18.130.090. The presiding officer did not err by refusing to dismiss the Medical Commission's statement of charges against Dr. Lang.

### Pro-Tem Panel

¶52 Department of Health policy D14.03 requires that the Department appoint a pro-tem panel to consider investigation and charges against a current commission member. The pro-tem panel also has the authority to delegate final decision-making authority to a presiding officer. Drs. Lang and Paxton contend the Department violated its own policy by (1) allowing the charging decision to be made by a panel, not a pro-tem panel, and (2) allowing the panel, not a pro-tem panel, to delegate final decision-making power to the presiding officer. Drs. Lang and Paxton assert that the Department's failure to follow its own procedures prejudiced the doctors.

¶53 "[A]n administrative body must follow its own rules and regulations when it conducts a proceeding which can deprive an individual of some benefit or entitlement." *Ritter v. Bd. of Comm'rs*, 96 Wn.2d 503, 507, 637 P.2d 940 (1981). However, the APA provides that interpretive and policy statements are only advisory. RCW 34-.05.230(1). Consequently, a divergence from a policy such as policy D14.03 does not necessarily violate due process. And the failure of an agency to follow its own procedures does not establish a procedural due process violation unless the claimant is prejudiced. *Motley-Motley, Inc. v. Pollution Control Hearings Bd.*, 127 Wn. App. 62, 81, 110 P.3d 812 (2005), *review denied*, 156 Wn.2d 1004 (2006). A showing of prejudice is based on the claimant's inability to prepare or present a defense. *Id.*

### CHARGING DECISION

¶54 Dr. Paxton was a member of the Dental Commission. To ensure fairness, the complaint was handled by a medical investigator, not a dental investigator. The deci-

sion to charge Drs. Lang and Paxton was made by a panel of Dental Commission members who did not sit on Dr. Paxton's panel. The panel was not a pro-tem panel. However, when the case was presented, Dr. Paxton's identity was not disclosed and there was no indication that a member of the Dental Commission was being charged. To avoid any concerns of favoritism or discrimination, the panel reviewed the case anonymously.

¶55 The failure to use a pro-tem panel here did not adversely affect the appearance of fairness or prejudice Drs. Lang and Paxton's right to receive notice and their ability to be heard. Moreover, Drs. Lang and Paxton can show no prejudice. Drs. Lang and Paxton fail to show how the failure to use a pro-tem panel to make the decision to charge affected their ability to prepare a defense. Here, Drs. Lang and Paxton admit that they employed assistants who started IVs and delivered anesthetic.

¶56 Drs. Lang and Paxton also suggest that the delegation to the Commissions' presiding officer deprived them of their right to present their defense to their peers. There is no statutory or constitutional support for this assertion. Here, as in *Ritter*, even though the policy was not followed, the doctors' due process rights were not violated. *See Ritter*, 96 Wn.2d at 511-13.

COMMISSIONS' DELEGATION OF DECISION-MAKING

¶57 The Medical Commission and Dental Commission have the statutory authority to delegate decision-making authority to a presiding officer. RCW 18.130.050(8). Also, an agency head may delegate, to a presiding officer, the authority to make a final decision and enter a final order. RCW 34.05.425(1)(b).

¶58 Policy D14.03 authorizes that a pro-tem panel should decide cases involving current commission members. A reading of D14.03 indicates a strong policy concern for the preservation of the appearance of fairness that might be compromised by having decisions related to a commission member rendered by a panel of his or her colleagues.

¶59 Because there is statutory authority for the delegation of decision-making to a presiding officer, and no statutory authority requiring a pro-tem panel, the delegation of the decision-making power by a panel was appropriate. This delegation maintained the appearance of fairness.

¶60 The failure to use a pro-tem panel did not violate Drs. Lang and Paxton's statutory or constitutional rights.

### Motion To Compel

¶61 Drs. Lang and Paxton received permission to serve interrogatories on the Department. Dissatisfied with the answers they received, they filed a motion to compel. Drs. Lang and Paxton now challenge the presiding officer's denial of this motion. Drs. Lang and Paxton contend that the Department did not fully respond to their interrogatories and that the answers given failed to identify specific bases for the charges and, instead, identified the entire investigative file.

¶62 The Commissions' presiding officer had the authority under the APA to decide what discovery forms could be used. RCW 34.05.446. A court has wide discretion when ordering pretrial discovery, and this court will not disturb this type of decision absent an abuse of discretion. *See Demelash v. Ross Stores, Inc.*, 105 Wn. App. 508, 519, 20 P.3d 447 (2001). CR 33(c) provides that an interrogatory may be answered by reference to a business record.

¶63 The Department's charges against Dr. Lang and Dr. Paxton were based solely on the allegation that unlicensed assistants were used to "start intravenous lines, and draw and administer intravenous sedation drugs." AR at 1. The charges here were based on the doctors' admissions and the statements of their past and present employees. The Department did not seek to introduce any witnesses or facts not contained in the investigative file. In its answers to the interrogatories, the Department gave some page numbers and identified various witness statements.

¶64 The Commissions' presiding officer did not abuse his discretion by denying the motion to compel.

## SANCTIONS

¶65 The Uniform Disciplinary Act allows a disciplining authority, or its delegates, to impose sanctions based on a finding of unprofessional conduct. RCW 18.130.160. When imposing sanctions, the disciplining authority must consider what is necessary to protect the public. RCW 18.130.160. A court is authorized to reverse an agency order if the order is arbitrary or capricious. RCW 34.05.570(3)(i). An arbitrary or capricious action is a willful and unreasoning action made without consideration and without regard to the facts and circumstances. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 609, 903 P.2d 433 (1995) (quoting *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983)).

¶66 Here, the Commissions' presiding officer directed Drs. Lang and Paxton to cease their practice of having unlicensed employees start IV lines and administer anesthetic. The presiding officer also ordered Drs. Lang and Paxton to pay fines of $5,000 each.

¶67 The Commissions' presiding officer—after two days of hearings, numerous exhibits, and a full consideration of the doctors' arguments—did not make an arbitrary or capricious decision. In the statute regulating dentists, the legislature declared that the health and welfare of the people of the state are of paramount importance. RCW 18.32.002. And our Supreme Court has confirmed that a disciplining authority performs a special function of protecting the public. *See Nguyen*, 144 Wn.2d at 533; *In re Revocation of License to Practice Med. & Surgery of Kindschi*, 52 Wn.2d 8, 11, 319 P.2d 824 (1958). Given the serious risk to the public in having unlicensed persons start

IVs and administer anesthetic, the sanctions were conservative and not arbitrary or capricious.

¶68 We affirm.

SWEENEY, C.J., and SCHULTHEIS, J., concur.

Review denied at 162 Wn.2d 1021 (2008).