[No. 58232-1-I.   Division One.   September 4, 2007.]

STEPHEN L. ANCIER, *Appellant*, v. THE DEPARTMENT OF HEALTH, MEDICAL QUALITY ASSURANCE COMMISSION, *Respondent*.

*Ralph D. Pittle* (of *Medical Legal Consultants of Washington*), for appellant.

*Robert M. McKenna, Attorney General*, and *Susan L. Pierini, Assistant*, for respondent.

¶1 ELLINGTON, J. — The Medical Quality Assurance Commission (Commission) concluded that Dr. Stephen Ancier's practice of prescribing medications over the Internet constituted unprofessional conduct. That conclusion is amply supported by the record, and the Commission did not violate due process by referring to its own guidelines in assessing the standard of care. We affirm the revocation of Ancier's license.

## BACKGROUND

¶2 Dr. Stephen Ancier is licensed to practice medicine in Washington. He lives in New Jersey and has never resided in this state except during temporary work assignments. In 2003, the Washington State Department of Health (Department) received two independent complaints about Ancier, both alleging that he had prescribed medication over the Internet solely upon the basis of an online questionnaire, without any physical examination of or direct communication with the patient.

¶3 The Department investigated and, in January 2004, charged Ancier with unprofessional conduct in violation of the Uniform Disciplinary Act, chapter 18.130 RCW. The Commission held a hearing over two days in February 2005.

¶4 Dr. Ancier is affiliated with an assortment of Internet-based companies offering prescription medication to customers without existing prescriptions. This type of business

is to be contrasted with Internet pharmacies, which fill prescriptions issued by a patient's personal physician.

¶5 In general, the process works as follows. Customers visit a web site offering a variety of pharmaceutical medications. They apply for a prescription by completing a questionnaire. Applicants must attest they have undergone recent physical examinations, will schedule routine physicals for the duration of the prescription, and will consult local physicians or pharmacists about any adverse reactions or complications. Applicants must also consent to a customer responsibility statement, which represents that the customer has used the medication in the past, has recently been examined by a doctor, and that "my doctor has informed me that I should use the requested medication(s)."[1] However, applicants can complete the customer responsibility statement without actually reading the document or the attestations within it.

¶6 The physician's role is to review these applications and decide whether to issue the requested prescription. Physicians are paid for each application reviewed, regardless whether the prescription is granted. Between 2001 and 2004, Dr. Ancier reviewed approximately 200,000 requests and issued 180,000 prescriptions. He did not physically examine or personally interview any of the persons receiving the prescriptions.

¶7 In addition to evidence of the general process, the Department presented testimony from two patients for whom Ancier prescribed medication. Patient One completed the online questionnaire, which included his height and weight, and requested the medication Phentermine for weight loss. He agreed to monitor his blood pressure and to stop taking the medication if his blood pressure rose to a certain level. Within days of completing the questionnaire, he received the medication in the mail. The label on the bottle listed Ancier as the prescribing physician.

---

[1] Certified Appeal Board Record (CABR) at 284.

¶8 Patient Two wanted to purchase Xenical, also a drug for weight loss management. He answered nine questions, including Question 9, which inquired:

Please explain the specific medical reason for ordering this medication. The physician must know the exact nature of your medical problem in order to prescribe this medication. This cannot be left blank.[2]

Patient Two responded with two words: "Need Xenical."[3] He received the requested medication the next day. Ancier was listed as the prescribing physician. The dispensing pharmacy's phone number was the only contact number listed in the packaging.

¶9 The Department also presented testimony from an employee at the Texas State Board of Pharmacy who had investigated consumer complaints about a Texas pharmacy and discovered that Ancier had authorized large numbers of prescriptions for the erectile dysfunction medications Viagra and Sildenafil. According to records submitted by the pharmacy and compiled by the Texas Board of Pharmacy, Ancier had issued 2,920 prescriptions between 2001 and 2003 to clients in 50 states and territories, including Washington.

¶10 Ancier testified that the majority of the prescriptions he issued were for Viagra and Sildenafil, but that he prescribed a host of drugs, including several classified as Schedule IV by the federal government (indicating that they are addictive).[4] Ancier never physically saw or examined any of his patients. He did not diagnose the customer's condition or select the drug appropriate to treat the alleged diagnosis. The inquiry as to the patient's medical history

---

[2] Clerk's Papers at 290.

[3] Id.

[4] Ancier testified that he had prescribed all of the drugs offered by one of the web sites. The 53 medications offered on that web site are categorized to treat the following health concerns: sleep aids, muscle relaxers, weight loss, men's health, anxiety, pain medicine, women's health, sexual health, skin care, smoking, laxatives, and heartburn.

was limited to: "Is there anything in your medical history *that you consider to be relevant?*"[5] In Ancier's own words, "they [the patients] would choose their medication."[6]

¶11 Otherwise, Ancier's communication with customers was extremely limited. Customers received printed sheets containing warnings about side effects and contraindications, always with a disclaimer admonishing the customer to "consult your healthcare professional before using this drug."[7] As with Patient Two, the contact information provided on the prescription was the phone number for the dispensing pharmacy. Customers received e-mail reminders suggesting refills at appropriate times. Though many customers would send updated information such as blood pressure measurements with their refill requests, Ancier did not require such information before refilling a prescription. Nor did he initiate any follow-up with customers as to their response to the medication. The Internet companies had Ancier's permission to provide customers with his contact information, but the primary contact was the company's customer service department, through which Ancier would relay answers to their questions.

¶12 The Commission concluded that Ancier's conduct violated the Uniform Disciplinary Act, which defines "unprofessional conduct" as:

> (1) The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not. . . .
>
> . . . .
>
> (4) Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed. The use of a nontraditional treatment by itself shall not constitute unprofessional conduct,

---

[5] CABR at 290 (emphasis added).

[6] CABR at 1347-48.

[7] CABR at 271.

provided that it does not result in injury to a patient or create an unreasonable risk that a patient may be harmed.[8]

The Commission revoked Ancier's license indefinitely, prohibited him from seeking relicensure for 10 years, and ordered him to pay a fine of $10,000.

¶13 The superior court affirmed the Commission's rulings.

## DISCUSSION

¶14 Ancier does not dispute the facts described above and does not assign error to the findings that outline the details of his Internet prescribing practice. Nor does he dispute the finding that his conduct fell below the standard of care. Rather, he challenges the sufficiency of the evidence that his conduct created an unreasonable risk of harm to patients.

¶15 The Commission entered three separate findings regarding Ancier's creation of an unreasonable risk of harm to patients. Finding of fact 1.8 described Ancier's conduct generally:

> 1.8 Since the Respondent did not personally interview any of these patients for whom he prescribed over the Internet, he could not verify their identities. The Respondent's prescribing practice over the Internet failed to meet the standard of care and also directly violated established guidelines. The Respondent failed to conduct physical exams that are crucial for arriving at correct diagnoses. For some medications, the Respondent failed to undertake baseline clinical testing for purposes of making a diagnosis or for eliminating other possible diagnoses or illnesses. By prescribing over the Internet, the Respondent failed to take measures for follow-up care and/or counseling. The Respondent's conduct of prescribing medications over the Internet was negligent and such conduct created an unreasonable risk that the patients may be harmed.[9]

---

[8] RCW 18.130.180.

[9] Clerk's Papers at 11-12.

Findings of fact 1.11 and 1.18 were specific to the two patients who testified at the hearing:

1.11 Since the Respondent did not personally interview Patient One, the Respondent could not verify Patient One's identity. Since the Respondent did not physically examine Patient One, the Respondent could not establish a diagnosis to justify prescribing Phentermine. Further, by prescribing such diet medication over the Internet without physically examining Patient One, as well as providing proper counseling, treatment plan and follow up care, the Respondent's treatment of Patient One failed to follow established AMA [American Medical Association] and Commission guidelines for Internet prescribing. The Respondent's conduct was below the standard of care. The Respondent's conduct of prescribing medications over the Internet to Patient One was negligent and such conduct created unreasonable risk that Patient One may be harmed.

. . . .

1.18 The Respondent's prescribing practices for Patient Two over the Internet failed to follow established AMA and Commission guidelines for Internet prescribing. By prescribing such diet medication over the Internet without providing proper counseling, treatment plan and follow up care, the Respondent's treatment of Patient Two failed to meet the standards prescribed by the American Gastroenterological Association. The Respondent's conduct was below the standard of care. The Respondent was negligent and such conduct created an unreasonable risk that Patient Two may be harmed.[10]

¶16 The standard of proof at the agency level in a medical disciplinary proceeding is clear and convincing evidence.[11] We review the Commission's findings for substantial evidence, as provided by the Administrative Procedure Act (APA), chapter 34.05 RCW.[12] Evidence is substan-

---

[10] Clerk's Papers at 13, 15.

[11] *Bang D. Nguyen v. Dep't of Health, Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 518, 29 P.3d 689 (2001); *Lang v. Dental Quality Assurance Comm'n*, 138 Wn. App. 235, 243, 156 P.3d 919 (2007).

[12] RCW 18.130.100; *see also* RCW 34.05.570(3)(e). We decline Ancier's invitation to use the Supreme Court's opinion in *Nguyen*, 144 Wn.2d at 518 as an opportunity to fashion a new and higher standard of review for appeals in medical

tial when it is sufficient to persuade a reasonable person of the truth or correctness of the order.[13] On a sufficiency challenge, we take the Department's evidence as true, and draw all inferences in the Department's favor.[14]

¶17 The Department presented the testimony of Dr. Leslie Enzian, a Washington physician, who identified the risks associated with Ancier's behavior. Dr. Enzian testified that without personally examining the patients, Dr. Ancier was unable to safeguard against improper diagnoses or identify whether a patient had an additional condition likely to cause an adverse reaction to the prescribed drug. Enzian testified that reliance on questionnaires was inadequate, especially since many customers would likely be seeking the prescription over the Internet precisely because their personal doctor declined to authorize it. In the absence of face-to-face contact with a patient, there is no opportunity to assess the patient's physical condition or credibility.

¶18 Enzian described some of the potential health concerns associated with the drugs Ancier prescribed, risks that can largely be averted by testing and monitoring a patient before and during medication. For example, Viagra is contraindicated for patients already taking nitroglycerin to treat coronary artery disease. Weight loss drugs such as Xenical or Phentermine are inappropriate when patients have liver failure, hypertension, hypothyroidism, hypolipidemia, sleep apnea, and cardiovascular disease. Phentermine can precipitate angina or heart attacks in patients

---

disciplinary proceedings. *Nguyen* clarified the standard of proof but does not address the standard of appellate review, which is established by the legislature. Ancier provides no persuasive argument that the *Nguyen* case has any effect upon the standard of appellate review. Appellate courts do not reweigh the evidence but are limited to assessing whether that evidence was adequate to satisfy the applicable burden of proof below. Even were we to do so, however, we have no doubt whatsoever that here the evidence met the clear, cogent, and convincing standard.

[13] *Lawrence v. Dep't of Health*, 133 Wn. App. 665, 671, 138 P.3d 124 (2006).

[14] *Ongom v. Dep't of Health*, 124 Wn. App. 935, 949, 104 P.3d 29 (2005), *reversed on other grounds*, 159 Wn.2d 132, 148 P.3d 1029 (2006).

predisposed to cardiovascular disease and is known to cause chemical dependence.[15]

¶19 Ancier presented the testimony of two experts, Dr. Miles Jones and Dr. Henry Jones, both of whom offered the opinion that Internet prescribing is not only safe, it is safer for patients than office or hospital prescribing. Dr. Henry Jones cited statistics showing that adverse reactions to drugs dispensed in doctors' offices and hospitals injure over 1,000,000 people annually, with approximately 188,000 fatalities. Jones quoted reports that adverse drug reactions occurred in 5 to 24 percent of cases in doctors' offices and hospitals. By contrast, Jones calculated the rate of adverse drug reactions in his Internet prescribing practice at below one percent and concluded that Internet prescribing is 10 times safer than getting an office prescription and 100 times safer than treatment at a hospital. Jones also testified that a physical examination can be helpful in arriving at a diagnosis, but not in all circumstances. He professed that because he "believe[s] [his] patients," he feels secure diagnosing and prescribing on the basis of information provided in online health questionnaires.[16]

¶20 Dr. Miles Jones cited similar statistics and also lauded the safety of Internet prescribing, stating that no

---

[15] In addition to the risks of Viagra, Phentermine, and Xenical prescribed to Patients One and Two and the nearly 3,000 customers supplied by the Texas pharmacy, Enzian elaborated on the dangers posed by the complete list of medications Ancier prescribed. Sibutramine, the generic name for Meridia, another weight loss medication, can exacerbate congenital heart failure. Terbenafine, which treats infected toes and fingernails, can cause liver toxicity, particularly in patients who have Hepatitis C, a disease that is widely prevalent but frequently does not manifest symptoms and therefore must be identified through testing. Patients should undergo preliminary liver function tests and regular monitoring while on that medication. Ancier prescribed several antidepressants without first assessing patients for suicidal ideations. Nor did Ancier's practice include face-to-face follow-up with depressed patients to assess the efficacy of their treatment. The antidepressant Buspar can cause a manic outbreak if dispensed to someone who is in a depressed phase of bipolar disease rather than actually clinically depressed. Like Phentermine, Ambien (a sleep aid), Ultram (a pain reliever), and Fioricet (a pain reliever often prescribed for migraines) present a risk of dependency. Before prescribing, a doctor should assess a patient for risks of misuse, including a history of substance abuse or the presence of mental illness. Ultram also presents risks of seizure.

[16] CABR at 1902.

other group of doctors "can come close" to only one patient death in 270,000.[17] Dr. Jones arrived at this number by combining Dr. Ancier's 200,000 prescriptions, Dr. Henry Jones's 20,000, and his own 50,000 prescriptions. Jones dismissed concerns that doctors prescribing without conducting a physical examination are less able to assess their patients' credibility, citing statistics that 25 percent of all patients lie to their doctors, and that all doctors must therefore check a patient's responses for internal consistency. Dr. Jones acknowledged that prescribing over the Internet without conducting any physical examination or direct communication with the patient is not accepted in most states, as evidenced by the revocation of his license to practice in all but one of the 20 states in which he was at one time licensed to practice.

¶21 *General Safety of Internet Prescribing.* Ancier first contends the Department failed to rebut his experts' testimony about the safety of his practice. This argument fails in its initial premise. The Commission "was persuaded and agreed with the expert testimony provided by Dr. Enzian."[18] The Commission thus disregarded Ancier's experts' testimony, as it was entitled to do, and there was nothing for the Department to rebut.

¶22 The Commission was the fact finder, entitled to weigh the credibility of each witness and determine what weight to give each opinion, if any. This court may not reevaluate the record to make an independent credibility determination.[19]

¶23 Further, it is clear from the record why the Drs. Jones were unconvincing. Neither presented a credible methodology supporting his conclusions. For example, Dr. Henry Jones relied on voluntary reporting from customers

---

[17] CABR at 1459.

[18] Clerk's Papers at 18.

[19] *Bang D. Nguyen v. Dep't of Health, Med. Quality Assurance Comm'n*, 99 Wn. App. 96, 994 P.2d 216 (1999), *vacated*, 144 Wn.2d 516, 29 P.3d 689 (2001).

solicited by e-mail. Of 16,551 surveys e-mailed to customers who had been issued a total of 19,132 prescriptions, only 951 were returned. But he calculated the rate of reported adverse reactions as a percentage of the original 19,000 prescriptions. And he compared his results to adverse reactions reported for office and hospital patients taking all manner of drugs, including injections such as chemotherapy and other high-toxicity medications rather than limiting it to medications comparable to those that he prescribed. Ultimately, he conceded that even he does not think his calculations are accurate. Dr. Miles Jones's conclusions were similarly assailable.

¶24 Not only were their statistics contrived, their opinions questionable, and their protocols not accepted in the medical community, both doctors have been disciplined in other states for Internet prescribing. Dr. Henry Jones was in the midst of litigation with the California licensing board and allowed his Louisiana license to lapse without renewal after the Louisiana board insisted he cease prescribing over the Internet. Dr. Miles Jones's license has been revoked in 19 of the 20 states where he was credentialed; at the hearing, he was reticent to disclose his remaining Delaware license, anticipating it too would be revoked under reciprocity rules.

¶25 In sum, Ancier's evidence defeated itself. The Commission's finding that Ancier violated subsection (1) of the Uniform Disciplinary Act is amply supported by the evidence.

¶26 *Risk of Harm to Patients.* Both Dr. Miles Jones and Dr. Henry Jones testified that their respective procedures for prescribing online were safe, but neither testified that Ancier's procedure is safe. And Dr. Miles Jones explicitly stated that he would not have prescribed some of the drugs Ancier offered without a physical examination because they are controlled substances and pose a risk of dependency. Nonetheless, Ancier contends the evidence is insufficient to establish that his conduct caused a risk of harm to the two patients involved here because both sought the prescription with no intention of taking the drugs.

■ ¶27  The flaw in this argument is the assumption that proof of an unreasonable risk of harm depends upon the secret mental state of the patient at the time of the application, or upon the patient's later caprice. A patient may never take a prescribed medication. But "risk" is "the possibility, chance, or potential of harm."[20] The question is an objective one: Was the physician's conduct such that it posed an unreasonable risk that a patient may be harmed?

■ ¶28  The evidence clearly established the risks inherent in Ancier's procedure from failure to diagnose any condition for which the drug was appropriate, failure to identify contraindications, failure to discover applicant deceit, and failure to monitor response to medication. Dr. Enzian also testified to specific risks associated with the drugs Ancier prescribed to the two patients. Additionally, Patient Two stated his weight as 195 pounds, which was outside the range for which the prescribed drug is appropriate.

¶29  Both the procedures and the drugs themselves posed risks to the patients. The fact that neither patient had a subjective intent to use the medications at the time of his application does not change the fact that the medications were delivered. Intent is a mental state, subject to change. Mere possession of a medication, provided under the authority of a prescribing physician, creates a risk that even the skeptical recipient will sample the drug or even take the complete prescription. The evidence fully supports the Commission's findings that Patient One and Patient Two were placed at unreasonable risk of harm and that Ancier violated subsection (2) of the Uniform Disciplinary Act.

¶30  Even were we to conclude otherwise, the finding that Ancier violated subsection (1), together with his record of past misconduct and sanctions,[21] would support the Commission's sanction.

---

[20] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1961 (1993).

[21] The Commission admitted evidence of a prior disciplinary action for consideration relating to the determination of sanctions.

¶31 *Due Process.* Finally, Ancier contends the whole proceeding was tainted in that he was the victim of prejudgment bias because in condemning his behavior, the Commission relied on its own guidelines, which disallow Internet prescribing as Ancier practiced it.[22] This argument is both without merit and irrelevant.

¶32 Both the Commission, as part of the Department, and the American Medical Association have established guidelines for the appropriate use of the Internet in medical practice. The Washington guidelines were adopted in 2002 and provide: "Treatment, including issuing a prescription, based solely on an online questionnaire or consultation does not constitute an acceptable standard of care."[23]

¶33 The American Medical Association's guidelines are incorporated by reference into the state guidelines,[24] and similarly condemn prescribing without a physical examination conducted in person:

> Physicians who prescribe medications via the Internet shall establish, or have established, a valid patient-physician relationship, including, but not limited to, the following components. The physician shall: (i) obtain a reliable medical history *and perform a physical examination of the patient*, adequate to establish the diagnosis for which the drug is being prescribed and to identify underlying conditions and/or contraindications to the treatment recommended/provided; (ii) *have sufficient dialogue with the patient regarding treatment options and the*

---

[22] Ancier alludes to the fact that the guidelines were allegedly adopted without formal APA rulemaking procedures, but does raise a separate due process challenge to the guidelines on that basis.

[23] Br. of Resp't, App. at 4. The Department submitted the text of state and American Medical Association guidelines on Internet prescribing as appendices to its brief. The printed guidelines were not part of the record below, but Dr. Enzian referred to them and summarized them in her testimony. Ancier does not object to their inclusion in the briefing, and we quote them directly for accuracy's sake.

[24] "Physicians should comply with nationally recognized health web site standards and codes of ethics, such as those promulgated by the American Medical Association." Br. of Resp't, App. at 5.

*risks and benefits of treatment(s)*; (iii) as appropriate, *follow up with the patient* to assess the therapeutic outcome.[25]

■ ■ ¶34 Due process is not offended where the legislature designs a combination of prosecutorial, investigative, and adjudicative functions, as it has here by empowering the Commission to develop rules and policies that "promote the delivery of quality health care" to Washington's residents, as well as to discipline providers so as to monitor and enforce consistent standards of practice.[26] Ancier makes no showing that the guidelines fall outside this broad authority. But Ancier misconstrues the role the guidelines played. Though the Commission clearly considered both its own and the American Medical Association guidelines and might well have rested its decision there, in fact the guidelines were not dispositive.[27]

¶35 But the question is irrelevant. The guidelines describe a standard of care, and Ancier admits that his conduct fell below the standard of care. The only issue squarely presented by this appeal is whether his conduct posed an unreasonable risk of harm, which is a matter not addressed by the guidelines.

¶36 We affirm the Commission's ruling in all respects.

APPELWICK, C.J., and BECKER, J., concur.

---

[25] *Id.* at 7 (emphasis added).

[26] RCW 18.71.002.

[27] *See* Finding of Fact 1.8: "[Ancier's practice] failed to meet the standard of care and also directly violated established guidelines." Clerk's Papers at 11.