IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| HUNG DANG, M.D., | ) | No. 78910-4-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| Judicial Review Agency Action of the | ) | |
| WASHINGTON STATE DEPARTMENT | ) | |
| OF HEALTH, MEDICAL QUALITY | ) | |
| ASSURANCE COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | FILED: August 19, 2019 |

SCHINDLER, J. — Hung Dang, MD appeals the superior court order affirming the decision of the Washington State Department of Health Medical Quality Assurance Commission (MQAC). MQAC concluded Dr. Dang committed unprofessional conduct in violation of the Uniform Disciplinary Act, chapter 18.130 RCW; ordered oversight of his license; and imposed at $5,000 fine. We affirm the amended MQAC decision and final order.

On Call at St. Joseph Medical Center

Dr. Hung Dang is an otolaryngologist, specializing in the treatment of the ear, nose, and throat (ENT). Dr. Dang works at Group Health Cooperative[1] in Tacoma. As

_____

[1] We note Kaiser Permanente acquired Group Health in 2017. We use "Group Health" throughout the opinion.

a condition of his employment with Group Health, Dr. Dang maintains staff privileges and works as an on-call emergency ENT specialist at St. Joseph Medical Center in Tacoma. St. Joseph is one of several hospitals in the CHI Franciscan Health System and is a level II trauma center. The CHI Franciscan Health System is a nonprofit corporation dedicated to providing healthcare consistent with Catholic Health Initiatives. The other hospitals include St. Francis Hospital in Federal Way, St. Clare Hospital in Lakewood, St. Anthony Hospital in Gig Harbor, and St. Elizabeth Hospital in Enumclaw.

Emergency Medical Treatment and Labor Act

The Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, requires hospitals to treat patients that need emergency care. The purpose of EMTALA is to ensure that individuals receive adequate emergency medical care regardless of ability to pay. Jackson v. E. Bay Hosp., 246 F.3d 1248, 1254 (9th Cir. 2001). Under EMTALA, a hospital must provide appropriate emergency medical care or transfer the patient to another medical facility. 42 U.S.C. § 1395dd(b)(1).

An on-call physician may not refuse to provide medical care and treat a patient properly transferred by an emergency room (ER) physician. 42 U.S.C. § 1395dd(d)(1)(B). Under 42 U.S.C. § 1395dd(d)(1)(B), a physician "is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on call for the care of such an individual." A hospital that can provide specialized care may not refuse to accept an appropriate transfer from a referring hospital if the receiving hospital has the capacity to treat the patient. 42 U.S.C. § 1395dd(g), (c)(2)(B). A transfer to a medical facility is appropriate if "the transferring hospital provides the medical treatment within its capacity which minimizes the risks to

2

the individual's health," the receiving facility "has available space and qualified personnel for the treatment of the individual," and the receiving facility "has agreed to accept transfer of the individual and to provide appropriate medical treatment." 42 U.S.C. § 1395dd(c)(2)(A), (B).

Statewide Emergency Medical Trauma Care Centers

In 1990, the Washington State Legislature enacted the Statewide Emergency Medical Services and Trauma Care System Act (EMSTCSA), chapter 70.168 RCW, "to establish an efficient and well-coordinated statewide emergency medical services and trauma care system." LAWS OF 1990, ch. 269; RCW 70.168.010(3). The legislature states the intent of EMSTCSA is to "reduce costs and incidence of inappropriate and inadequate trauma care and emergency medical service and minimize the human suffering and costs associated with preventable mortality and morbidity." RCW 70.168.010(3). The objective of EMSTCSA is to "(a) [p]ursue trauma prevention activities to decrease the incidence of trauma; (b) provide optimal care for the trauma victim; (c) prevent unnecessary death and disability from trauma and emergency illness; and (d) contain costs of trauma care and trauma system implementation." RCW 70.168.010(4).

EMSTCSA requires the Washington State Department of Health to designate trauma care services at hospitals. RCW 70.168.015(5). EMSTCSA categorizes hospitals into one of five levels of care. RCW 70.168.015(4). EMSTCSA designates the level of trauma care services at each hospital as level I to level V, the highest level of trauma care to the lowest level of trauma care. RCW 70.168.015(4), (15), (23). Lower level designated trauma centers can transfer patients to high-level hospitals for

care and treatment by a specialist. RCW 70.168.015(23); WAC 246-976-700(8), (9). Designated trauma service care hospitals must provide emergency and trauma services to all patients requiring care without regard to ability to pay. RCW 70.168.130(3)(b).

Uniform Disciplinary Act

The Uniform Disciplinary Act (UDA), chapter 18.130 RCW, governs licensing and discipline of physicians. The purpose of the UDA is (1) to protect the public and (2) to protect the standing of the medical profession in the eyes of the public. In re the Revocation of the License To Practice Medicine & Surgery of Kindschi, 52 Wn.2d 8, 11, 319 P.2d 824 (1958). The UDA gives the Washington State Department of Health Medical Quality Assurance Commission (MQAC)[2] the authority to regulate, monitor, and discipline physicians. RCW 18.30.040(2)(b)(ix); chapter 18.71 RCW; chapter 18.71A RCW.

Statement of Charges

On April 4, 2016, the Washington State Department of Health Medical Program (Department of Health) filed a statement of charges against Dr. Dang, alleging violation of EMTALA and RCW 18.130.180(1), (4), and (7) with respect to "Patient A," "Patient B," and "Patient C." RCW 18.130.180, "Unprofessional Conduct," provides, in pertinent part:

> (1) The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not. . . .
> . . . .
> (4) Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed. . . .
> . . . .

---

[2] In July 2019 (LAWS OF 2019, ch. 55, § 7), MQAC became the "Washington Medical Commission."

4

(7) Violation of any state or federal statute or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice.[3]

Patient A

On October 20, 2012, 61-year-old Patient A went to the ER at St. Clare Hospital. St. Clare is a level IV trauma center. Patient A had a history of thyroid cancer and undergone prior neck surgery. On October 20, Patient A had "facial swelling, an enlarged tongue with airway obstruction, and difficulty with breathing and swallowing." A CT[4] scan showed

> bilateral lymph node dissection of the neck, enlargement of the base of the tongue with contiguous abnormal soft tissue swelling of the left oral floor and left lateral wall of the oral cavity, possibly representing a recurrent squamous cell carcinoma or an infectious or inflammatory process.

St. Clare did not have an on-call ENT doctor. The ER doctor concluded Patient A needed a higher level of care from an ENT specialist. The ER doctor contacted Dr. Dang at St. Joseph to request transfer of Patient A. Dr. Dang refused to accept the transfer of Patient A because he was not on call for St. Clare but consulted with the ER doctor and said the patient could "follow up with the clinic on Monday."

Because of "the dangerous nature of Patient A's possible airway obstruction," the St. Clare ER doctor believed "a more urgent consult" was necessary and transferred Patient A to Harborview Medical Center, a level I trauma center. Harborview accepted the transfer. St. Clare airlifted Patient A to Harborview. An ENT specialist diagnosed Patient A with "acute angioedema" and admitted Patient A to intensive care.

---

[3] The legislature amended RCW 18.130.180 several times after 2016. LAWS OF 2018, ch. 216, § 2; LAWS OF 2018, ch. 300, § 4; LAWS OF 2019, ch. 427, § 17. The amendments do not change the language pertinent to our analysis.

[4] Computed tomography.

Patient B

On November 23, 2013, 34-year-old Patient B went to the ER at St. Francis Hospital for "sore throat, swelling, and difficulties with swallowing and breathing." St. Francis is a level IV trauma center. A CT neck scan "showed fluid collection and findings consistent with tonsillar abscess." The ER doctor concluded Patient B should be transferred to St. Joseph for consultation and treatment by an ENT specialist. St. Francis staff contacted St. Joseph on-call ENT specialist Dr. Dang to request the transfer. Dr. Dang refused to consult or accept the transfer.

Patient C

On June 8, 2014, 24-year-old Patient C went to the ER at St. Clare. Patient C had pain in his ear and throat and trouble swallowing. The ER doctor diagnosed Patient C with a tonsillar abscess and a potential "life-threatening" airway obstruction.

> Patient C was diagnosed with tonsillar abscess (a collection of pus behind the tonsils that involves pain, swelling, and often radiates into the ear) with mild airway obstruction. The treating staff suspected a retropharyngeal abscess (deep neck space infections that can pose an immediate life-threatening emergency with potential for airway compromise).

The ER doctor contacted St. Joseph on-call ENT specialist Dr. Dang to request a transfer for treatment. Dr. Dang refused to consult or accept transfer of Patient C because he was not on call for St. Clare.

The St. Clare ER doctor contacted Harborview. After learning Harborview did not have the capacity to accept transfer of Patient C, the St. Clare ER doctor called CHI Franciscan Associate Chief Medical Officer Dr. Kim Moore. Dr. Moore authorized transfer of Patient C from St. Clare to St. Joseph for consultation and treatment by the on-call ENT doctor.

When Patient C arrived at St. Joseph, Dr. Dang refused to consult or treat Patient C. Dr. Moore contacted Dr. Dang. Dr. Dang told Dr. Moore he would not treat Patient C. Six hours later, Dr. Moore transferred Patient C to Madigan Army Medical Center for treatment. Madigan is a level II trauma center.

Administrative Hearing

Dr. Dang retained an attorney and filed an answer to the statement of charges. Dr. Dang denied the allegations that he violated EMTALA or RCW 18.130.180(1), (4), and (7). Dr. Dang requested a hearing.

The three-day MQAC hearing began on January 30, 2017. The Department of Health called Dr. Dang; Dr. Moore; expert witness Warren Appleton, MD, JD; and St. Francis ER doctor Sarah Sliva to testify. Dr. Dang called expert witnesses Robert Bitterman, MD, JD and Dr. Alan Pokorny and his practice partner Dr. Alex Moreano to testify. The presiding chief health law judge admitted a number of exhibits into evidence, including the Franciscan Health System (FHS) medical records for Patients A, B, and C; the 2012 FHS bylaws; and orthopedic surgery records for Dr. Dang.

Dr. Dang testified he was acting as an on-call doctor only for St. Joseph. Dr. Dang testified he agreed to consult on Patient A. Dr. Dang asserted he did not refuse to consult on Patient B. Dr. Dang testified that he did not refuse to accept the transfer of Patient C. Dr. Dang said he told Dr. Moore that he was "not physically capable" of treating Patient C. Dr. Dang testified that in late February or early March 2014, he had ankle surgery. Dr. Dang said that he fell and injured his heel on June 8, 2014 and took a "hydrocodone and acetaminophen combination . . . pill" for the pain.

Dr. Moore testified that she approved the transfer of Patient C from the St. Clare ER to St. Joseph's ER. Dr. Moore said Dr. Dang "refused to come in and see the patient." Dr. Moore called Dr. Dang and "asked him to go in and see the patient as the on-call ear, nose and throat doctor." Dr. Dang told Dr. Moore he "would not go in to see the patient because the patient had come from St. Clare." Dr. Moore testified that Dr. Dang did not give "any other reason why he would not or could not come in and see the patient."

Dr. Moore testified Dr. Dang had a duty to come to the St. Joseph ER on June 8, 2014 to consult and treat Patient C. Dr. Moore said that "when a request is made for consult," the FHS bylaws state the "consultant must appear as - as reasonably as patient's needs dictate and if they are unable to care for the patient, then that physician needs to assist to find someone else who can." If the on-call doctor is unavailable, "the physician should try to find coverage or backup" and let the emergency department "know that there is a crisis" and that the physician is "not going to be available for call so if a patient presents that needs their services, they can start to look outside of that hospital." Dr. Moore testified Dr. Dang "did not tell me that he was unable to perform his [on-]call duties."

Expert witness Dr. Appleton testified that in his opinion, Dr. Dang violated the professional conduct of licensed health care providers under RCW 18.130.180 and EMTALA. Dr. Appleton testified that because of the dangerous nature of the airway obstruction, the ER doctor could not discharge Patient A and follow the advice of Dr. Dang to wait until the following Monday. Dr. Appleton testified Dr. Dang violated the standard of care by refusing to consult and admit Patient B to St. Joseph. Dr. Appleton

testified the condition of tonsillar abscess of Patient B was an emergency that required immediate treatment by an ENT specialist. Dr. Appleton testified the tonsillar abscess of Patient C was an unstable medical emergency condition and the refusal of Dr. Dang to consult and admit the patient violated the standard of care and EMTALA.

Dr. Dang's expert witnesses Dr. Bitterman and Dr. Pokorny testified that Dr. Dang did not violate the standard of care or EMTALA.

Dr. Moreano is an ENT surgeon and practice partner with Dr. Dang at Group Health in Tacoma. Dr. Moreano testified Group Health affiliated with St. Joseph in Tacoma. Dr. Moreano said that as the on-call ENT specialist at St. Joseph, he regularly receives calls from the ER doctor at St. Clare and St. Francis to consult. Dr. Moreano testified that he and the other two members of the Group Health ENT practice group, Dr. Dang and Dr. Ken Deem, "decided" to tell the ER doctors from the other FHS hospitals that "by the bylaws of the [FHS] system we were not obligated to get involved in - in the care of those patients." However, Dr. Moreano conceded, "We were told by our own [Group Health] leadership that we must comply with their request that we manage the patients from their entire system."

MQAC Decision and Order

On September 29, 2017, MQAC issued a 22-page decision, "Findings of Fact, Conclusions of Law, and Final Order." The MQAC decision sets forth extensive findings of fact that address FHS, EMTALA, statewide emergency medical trauma centers, and the emergency medical conditions of Patients A, B, and C. MQAC made a number of credibility findings. MQAC expressly found Dr. Dang's testimony that he did not refuse to consult on Patient B and that he was unable to treat Patient C not credible. MQAC

9

found Dr. Appleton's expert testimony that Dr. Dang violated RCW 18.130.180 and EMTALA more credible than the expert witnesses who testified on behalf of Dr. Dang.

MQAC found FHS has a procedure to transfer patients.

FHS has a Patient Placement Center, which may be used to organize or facilitate an orderly patient intake/transfer process. However, use of a Patient Placement Center does not preclude 'doctor to doctor' consults or transfer requests. Further, practitioners are not required by FHS to use the transfer/placement center. Moreover, failure to utilize a Patient Placement Center does not relieve a practitioner from his/her obligations under the Emergency Treatment and Active Labor Act.[5]

With respect to Patient A, MQAC concluded Dr. Dang did not violate RCW 18.130.180 or EMTALA. Specifically, MQAC found that with respect to Patient A, Dr. Dang "was not on-call" at St. Clare Hospital but consulted with the St. Clare ER doctor and suggested Patient A follow up with the clinic two days later.

MQAC concluded there was "insufficient evidence to find that the Respondent violated EMTALA with regard to Patient B." But MQAC concluded Dr. Dang violated RCW 18.130.180:

[T]he Respondent's refusal to consult with the emergency room doctor concerning the care of Patient B lowered the standing of the profession in the eyes of the public. In addition, the Respondent's refusal to consult with a fellow physician, acting in good faith to help a patient, created an unreasonable risk of harm to Patient B.

With respect to Patient C, MQAC concluded Dr. Dang violated EMTALA and RCW 18.130.180:

Patient C was experiencing an emergency medical condition, which had not been stabilized, and his transfer to [St. Joseph] was appropriate. As such, the Respondent violated EMTALA when he failed to treat Patient C, while on call for [St. Joseph]. However, assuming arguendo that the transfer was improper, the Respondent (as the on-call specialist), was nonetheless obligated under EMTALA to appear and treat Patient C once he was transferred to [St. Joseph]. In addition, the Respondent's failure to

---

5 Footnotes omitted.

identify a backup or to inform Dr. Moore (or [St. Joseph]) that he was unavailable at a time contemporaneous to the transfer, was inconsistent with Respondent's explanation. Lastly, the Respondent's refusal to treat Patient C created an unreasonable risk of harm to Patient C and lowered the standing of the profession in the eyes of the public.

MQAC ordered oversight of Dr. Dang's medical license for two years and imposed monitoring requirements and a $5,000 fine.

Motion To Reconsider

On October 11, 2017, the Department of Health filed a motion for reconsideration to correct two scrivener's errors in the final order. Dr. Dang did not file a response or object. On December 20, 2017, MQAC issued "Amended Findings of Fact, Conclusions of Law, and Final Order" correcting the two scrivener's errors.

Superior Court Appeal

Dr. Dang filed a petition for judicial review in superior court. The superior court affirmed the amended MQAC final order but modified the monitoring period to begin May 26, 2017 instead of September 29, 2017. Dr. Dang appeals the superior court "Order on Petition for Judicial Review."

Standard of Review

The Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, governs judicial review of disciplinary proceedings under the UDA, chapter 18.130 RCW. On review, we sit in the same position as the superior court and apply the WAPA standards directly to the record before the agency. Tapper v. Emp't Sec. Dep't, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). As the party challenging MQAC's decision, Dr. Dang bears the burden of establishing the decision is invalid under one or more of the WAPA criteria. RCW 34.05.570(1)(a).

Under RCW 34.05.570(3), we will reverse only if (1) the administrative decision is based on an error of law, (2) the administrative decision is unsupported by substantial evidence, (3) the administrative decision is arbitrary or capricious, (4) the administrative decision violates the constitution, (5) the order is inconsistent with a rule of the agency, (6) the agency employed improper procedures, or (7) the order is outside the agency's statutory authority. Tapper, 122 Wn.2d at 402. We review conclusions of law de novo. Haley v. Med. Disciplinary Bd., 117 Wn.2d 720, 730, 818 P.2d 1062 (1991). However, we give due deference to the expertise and knowledge of MQAC and substantial weight to the interpretation of the law the agency administers when it is within the agency's expertise. Haley, 117 Wn.2d at 728. MQAC may rely on its experience and specialized knowledge to evaluate the evidence when finding unprofessional conduct. RCW 34.05.452(5); WAC 246-11-160(2); In re Disciplinary Proceeding Against Brown, 94 Wn. App. 7, 13-14, 972 P.2d 101 (1998).

The standard of proof in a medical disciplinary proceeding is that findings of fact must be proved by clear and convincing evidence. Nguyen v. Dep't of Health, Med. Quality Assur. Comm'n, 144 Wn.2d 516, 529, 29 P.3d 689 (2001). We review MQAC's findings of fact like any other proceeding under WAPA for substantial evidence. Ancier v. Dep't of Health, Med. Quality Assur. Comm'n, 140 Wn. App. 564, 572, 166 P.3d 829 (2007). Evidence is substantial if it is sufficient to persuade a reasonable person of the truth or correctness of the order. Ancier, 140 Wn. App. at 572-73. We take MQAC's evidence as true and draw all inferences in MQAC's favor. Ancier, 140 Wn. App. at 573. We will not weigh conflicting evidence or substitute our judgment regarding witness credibility for that of MQAC. Davis v. Dep't of Labor & Indus., 94 Wn.2d 119,

124, 615 P.2d 1279 (1980). Unchallenged agency factual findings are verities on appeal. Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 244, 350 P.3d 647 (2015). After determining whether substantial evidence supports the findings of fact, the court determines whether the findings in turn support the conclusions of law and judgment. Nguyen, 144 Wn.2d at 530.

Unprofessional Conduct in Violation of RCW 18.130.180(1) and (4)

Dr. Dang claims that absent a finding that he owed a duty of care to Patients B or C, MQAC erred in deciding he violated RCW 18.130.180(1) and (4).

The plain language of RCW 18.130.180(1) and (4) does not require MQAC to find a duty of care. RCW 18.130.180(1) states, in pertinent part, that "unprofessional conduct" is "[t]he commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not." RCW 18.130.180(4) states, in pertinent part, that "unprofessional conduct" is "[i]ncompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed."

MQAC concluded Dr. Dang violated RCW 18.130.180(1) and (4) by refusing to consult or treat Patients B and C. MQAC found the "refusal to consult" with the ER doctor concerning treatment and care of Patient B "lowered the standing of the profession in the eyes of the public" and "created an unreasonable risk of harm to Patient B." MQAC concluded that the "refusal to treat Patient C created an unreasonable risk of harm to Patient C and lowered the standing of the profession in the eyes of the public."

13

Dr. Dang cites <u>Khung Thi Lam v. Global Medical Systems, Inc.</u>, 127 Wn. App. 657, 111 P.3d 1258 (2005), to argue that without finding he owed a duty of care, MQAC could not conclude he violated RCW 18.130.180(1) and (4). <u>Khung Thi Lam</u> is inapposite. In <u>Khung Thi Lam</u>, the court held the plaintiff must establish a duty of care to prevail on a medical malpractice claim. <u>Khung Thi Lam</u>, 127 Wn. App. at 669.

Dr. Dang argues his conduct did not constitute an act of moral turpitude under RCW 18.130.180(1). In <u>Haley</u>, the Washington Supreme Court held that the conduct of a physician constitutes an act of moral turpitude if the physician abuses the status of the profession or lowers the standard of the profession in the eyes of the public. <u>Haley</u>, 117 Wn.2d at 731-32. The conduct "must indicate unfitness to bear the responsibilities of, and to enjoy the privileges of, the profession." <u>Haley</u>, 117 Wn.2d at 731.

> To perform their professional duties effectively, physicians must enjoy the trust and confidence of their patients. Conduct that lowers the public's esteem for physicians erodes that trust and confidence, and so undermines a necessary condition for the profession's execution of its vital role in preserving public health through medical treatment and advice.

<u>Haley</u>, 117 Wn.2d at 734.

Dr. Dang cites <u>In re the License To Practice Pharmacy of Farina</u>, 94 Wn. App. 441, 972 P.2d 531 (1999), to argue his conduct did not constitute moral turpitude. <u>Farina</u> is inapposite. In <u>Farina</u>, the court addressed the difference between moral turpitude and violation of a criminal statute. <u>Farina</u>, 94 Wn. App. at 460. The court concluded violation of a criminal statute does not necessarily constitute an act of moral turpitude. <u>Farina</u>, 94 Wn. App. at 460-61. Conduct that meets the definition of "moral turpitude" is an act of "inherent immorality." <u>Farina</u>, 94 Wn. App. at 460-61.

14

Dr. Dang also claims MQAC applied a subjective standard in determining he committed unprofessional conduct in violation of RCW 18.130.180(1). The record does not support his argument. Substantial evidence supports the MQAC finding that Dr. Dang refused to consult or treat Patients B and C and the findings support the conclusion that Dr. Dang violated RCW 18.130.180(1) and (4).

Dr. Dang asserts that because there is no distinction between the circumstances of Patient A and Patient B, MQAC erred in reaching a different conclusion for Patient B. The record does not support his argument. MQAC found Dr. Dang did not refuse to consult with the ER physician with respect to Patient A and said, "Patient A could follow up with the clinic on Monday (two days later)."

MQAC found Dr. Dang committed unprofessional conduct in violation of RCW 18.130.180(1) and (4) with respect to Patient B. MQAC found that unlike Patient A, Dr. Dang refused to consult with the ER doctor about the care and treatment of Patient B.

> [Dr. Dang]'s refusal to consult with the emergency room doctor concerning the care of Patient B lowered the standing of the profession in the eyes of the public. In addition, [Dr. Dang]'s refusal to consult with a fellow physician, acting in good faith to help a patient, created an unreasonable risk of harm to Patient B.

Challenge to MQAC Finding Violation of EMTALA

Dr. Dang contends MQAC did not have the authority to address whether he violated EMTALA. In his prehearing statement in the MQAC proceeding, Dr. Dang argued MQAC did not have the authority to address whether he violated EMTALA. However, Dr. Dang did not raise the argument again.

The Department of Health contends Dr. Dang waived the right to raise this argument on appeal. We agree. In an appeal of a decision governed by WAPA, an

appellant can raise an issue for the first time on only if (1) the appellant did not know and had no duty to discover facts that gave rise to the issue, (2) the appellant did not have an opportunity to raise the issue, or (3) the issue arose from a change in controlling law or a change in agency action and the interests of justice require resolution. RCW 34.05.554(1)(a)-(d); King County v. Boundary Review Bd. for King County, 122 Wn.2d 648, 668, 860 P.2d 1024 (1993). An appellant must do more than raise the issue below. Boundary Review Bd., 122 Wn.2d at 670; Kitsap All. of Prop. Owners v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 160 Wn. App. 250, 271-72, 255 P.3d 696 (2011).

Nonetheless, we note that under the plain and unambiguous language of RCW 18.130.180(7), MQAC has the authority to determine whether "[v]iolation of any state or federal statue or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice," constitutes unprofessional conduct.[6]

Dr. Dang contends the United States Department of Health and Human Services Secretary has the exclusive authority to initiate proceedings under EMTALA, and only the United States Court of Appeals has jurisdiction over EMTALA claims.

The Department of Health filed charges under the UDA, not EMTALA. The authority of MQAC under the UDA does not conflict with EMTALA. EMTALA specifically states that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). In Goldfarb v. Virginia State Bar,

---

[6] Emphasis added.

16

421 U.S. 773, 792, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975), the United States Supreme Court recognized the compelling state interest in regulating healthcare professionals:

> [S]tates have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.

Violation of RCW 18.130.180(7)

Dr. Dang argues the evidence does not support the conclusion that he violated RCW 18.130.180(7). We disagree. Substantial evidence supports the conclusion that Dr. Dang violated RCW 18.130.180(7) by refusing to treat Patient C in violation of federal law. The ER doctor transferred Patient C to St. Joseph for treatment because he "was experiencing an emergency medical condition, which had not been stabilized." MQAC found the "transfer to [St. Joseph] was appropriate. As such, the Respondent violated EMTALA when he failed to treat Patient C, while on call for [St. Joseph]." Unchallenged finding of fact 1.17 states that "[a]fter Patient C arrived at [St. Joseph], the Respondent was again contacted and he continued to refuse to consult or to treat Patient C."

Dr. Moore testified that she recommended transferring Patient C from the St. Clare emergency department to the St. Joseph emergency department for treatment. Dr. Moore testified the St. Joseph emergency department (ED) doctor called her after he transferred Patient C because Dr. Dang refused to treat Patient C. Dr. Moore testified:

A   So after the patient was transferred ED to ED, the ED physician at St. Joseph contacted Dr. Dang and he refused to come in and see the patient, so they called me.
Q   Okay. And what did you do?

A And I called Dr. Dang.
Q Okay. You spoke with him directly?
A Yes.
Q Okay. What did he tell you or did you ask him to accept the patient or do you recall the conversation?
A To the best of my recollection, I believe that I asked him to go in and see the patient as the on-call ear, nose and throat doctor.
Q Okay. And what did he respond?
A He said he would not go in to see the patient because the patient had come from St. Clare.
Q Okay. Did he give you any other reason why he would not or could not come in and see the patient?
A No.
Q Okay. Did he inform you that he had been injured —
A No.
Q — or that he was otherwise unavailable?
A No.

Substantial evidence supports the MQAC finding that Dr. Dang violated RCW 18.130.180(7) and EMTALA by refusing to treat Patient C after St. Clare transferred Patient C to St. Joseph.

Denial of Request To Admit Documentary Evidence

Dr. Dang contends MQAC abused its discretion by denying his request to admit documentary evidence. Dr. Dang argues the evidence would have refuted the testimony of Dr. Moore and denial of his request is prejudicial.

At the end of his case, Dr. Dang sought to introduce new documentary evidence to rebut the testimony of Dr. Moore. "The new evidence was in the form of a string of emails addressed to and from the Respondent, Dr. Moore, and a number of addressees who did not testify at [the] hearing." The MQAC findings describe the documentary evidence:

> The emails ranged in time from the year 2011 to 2014. [Dr. Dang's attorney] represented that: a) the emails were taken from the Respondent's personal home computer; b) the emails had been in the

18

Respondent's possession; and c) they were not previously disclosed to [the Department of Health's attorney].

WAC 246-11-390(7) states:

Documentary evidence not offered in the prehearing conference will not be received into evidence at the adjudicative proceeding in the absence of a clear showing that the offering party had good cause for failing to produce the evidence at the prehearing conference.[7]

MQAC ruled Dr. Dang did not show good cause for failing previously to produce the documentary evidence:

Here, Dr. Moore was identified at the prehearing conference as a witness. The Respondent knew or should have known that any documents containing prior statements by Dr. Moore could become relevant. This is especially true given that the documents have been in the Respondent's sole possession since 2011 and 2014, respectively. Thus, these documents should have been disclosed if the Respondent desired to have them become part of the record. Moreover, any uncertainties pertaining to Dr. Moore's testimony could have been resolved by deposing her. However, the Respondent's failure to do either has resulted in prejudice to the Department at this stage of the proceeding. Consequently, the Respondent has failed to demonstrate the necessary good cause for failing to produce the evidence at the prehearing conference.[8]

The record supports the MQAC finding that Dr. Dang did not show good cause because he did not produce the documentary evidence at the prehearing conference.

RCW 34.05.461(8)(a)

Dr. Dang argues the final order should be reversed because MQAC did not issue the final order within the 90-day time limit under RCW 34.05.461(8)(a). The Department of Health argues the 90-day time limit is directory, not mandatory. We agree with the Department of Health.

---

[7] Dr. Dang asserts MQAC erred by not engaging in an analysis under Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997). Burnet does not apply to an administrative proceeding. WAC 246-11-390 controls.

[8] Footnote omitted.

RCW 34.05.461(8)(a) states, in pertinent part, that "final orders shall be served in writing within ninety days after conclusion of the hearing or after submission of memos, briefs, or proposed findings . . . unless this period is waived or extended for good cause shown." A statute setting a time within which a public officer is to perform an official act is directory unless the nature of the act or the language of the statute makes clear that the time designation limits the power of the officer. Niichel v. Lancaster, 97 Wn.2d 620, 623-24, 647 P.2d 1021 (1982). When the time for or manner of performing the authorized action is not essential to the purpose of the statute, the time and manner provisions are considered directory. Niichel, 97 Wn.2d at 624.

Amended Findings of Fact, Conclusions of Law, and Final Order

Dr. Dang cites RCW 34.05.470(3) to argue the Amended Findings of Fact, Conclusions of Law, and Final Order is unlawful because the presiding officer did not comply with the 20-day time limit to file an amended final order.

The Department of Health filed a timely motion for reconsideration of the final order to correct two scrivener's errors. Dr. Dang did not file a response to the motion or object. On December 20, 2017, MQAC issued an amended final order correcting the two scrivener's errors:

> [MQAC] notes that two Scrivener's errors occurred in the Final Order. A Scrivener's error appears in Paragraph 1.3, which reads "[t]he Respondent was employed by [St. Joseph] at all times . . . ["] instead of "[t]he Respondent was employed by Group Health Cooperative at all times relevant to this matter." In addition, a Scrivener's error appears in Paragraph 1.10, which reads "[s]pecifically, the Respondent was not on-call at [St. Joseph] . . . ," instead of "[s]pecifically, the Respondent was not on-call at St. Clare Hospital and thus had no duty to treat or accept the transfer of Patient A."[9]

---

[9] Emphasis in original; some alteration in original.

Dr. Dang argues that because he filed the petition for judicial review in superior court before the presiding officer issued the amended final order, CR 60(a) controls. But the civil rules do not apply to administrative agency proceedings. See DeLacey v. Clover Park Sch. Dist., 117 Wn. App. 291, 296, 69 P.3d 877 (2003).

Due Process

For the first time on appeal, Dr. Dang contends MQAC violated his procedural right to due process on a number of grounds. Subject to certain limited exceptions that are not applicable here, RCW 34.05.554(1) bars a litigant from raising issues on appeal not raised before the agency. With the exception of his claim that MQAC did not consider the telephonic testimony, we decline to consider the arguments he raises for the first time on appeal.

Procedural due process requires notice and an opportunity to be heard " 'at a meaningful time and in a meaningful manner.' " Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 216, 143 P.3d 571 (2006)[10] (quoting Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). "The process due depends on what is fair in a particular context." In re Det. of Morgan, 180 Wn.2d 312, 320, 330 P.3d 774 (2014). In Mathews, the United States Supreme Court articulated a balancing test to aid in determining when, and to what extent, procedural protections are required:

> [D]ue process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

---

[10] Internal quotation marks omitted.

Dr. Dang contends he did not have a meaningful opportunity to be heard during the three-day administrative hearing. The record does not support his argument. Dr. Dang was represented by counsel, he called expert witnesses to testify on his own behalf, his practice partner testified, he testified, and MQAC admitted documentary evidence he presented.

The transcript of the MQAC hearing indicates the testimony of the witnesses who testified by telephone is not "audible." Dr. Dang contends that because the transcript shows the testimony of his expert witnesses Dr. Bitterman and Dr. Pokorny and the testimony of Dr. Sliva was "not audible," MQAC ignored that testimony. The record does not support his argument.

The witnesses testified at the hearing. The Amended Findings of Fact, Conclusions of Law, and Final Order makes clear that MQAC, Dr. Dang, his attorney, and the attorney for the Department of Health heard the testimony of Dr. Sliva, Dr. Bitterman, and Dr. Pokorny. The Department of Health attorney addressed the testimony of these witnesses in closing argument. Dr. Dang's attorney cited and relied on the testimony of Dr. Sliva, Dr. Bitterman, and Dr. Pokorny in closing argument. The record shows that in the decision, MQAC did not rely on the transcript from the hearing. The transcript of the hearing is not prepared until after a petition for judicial review is filed. See RCW 34.05.566.[11]

---

[11] RCW 34.05.566 states, in pertinent part, "(1) Within thirty days after service of the petition for judicial review, or within further time allowed by the court or by other provision of law, the agency shall transmit to the court the original or a certified copy of the agency record for judicial review of the agency action."

22

We affirm the Amended Findings of Fact, Conclusions of Law, and Final Order.[12]

WE CONCUR:

---

23